*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2000 FED App. 0186P (6th Cir.)
File Name:  00a0186p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

Nos. 98-6361/6362

JOHN R. PRINCE (98-6361),
TONY WHITE (98-6362),
*Defendants-Appellants.*

Appeal from the United States District Court
for the Western District of Tennessee at Jackson.
No. 97-10044—James D. Todd, District Judge.

Argued:  December 16, 1999

Decided and Filed:  June 1, 2000

Before:  MERRITT and SILER, Circuit Judges;
BECKWITH,[*] District Judge**.**

---

[*]The Honorable Sandra S. Beckwith, United States District Judge for the Southern District of Ohio, sitting by designation.

1

———————————————

**COUNSEL**

**ARGUED:** April R. Ferguson, OFFICE OF THE FEDERAL PUBLIC DEFENDER FOR THE WESTERN DISTRICT OF TENNESSEE, Memphis, Tennessee, G. William Hymers III, HARDEE, MARTIN, JAYNES & IVY, Jackson, Tennessee, for Appellants.    Richard Leigh Grinalds, ASSISTANT UNITED STATES ATTORNEY, Jackson, Tennessee, for Appellee. **ON BRIEF:** April R. Ferguson, OFFICE OF THE FEDERAL PUBLIC DEFENDER FOR THE WESTERN DISTRICT OF TENNESSEE, Memphis, Tennessee, G. William Hymers III, HARDEE, MARTIN, JAYNES & IVY, Jackson, Tennessee, for Appellants.  Richard Leigh Grinalds, ASSISTANT UNITED STATES ATTORNEY, Jackson, Tennessee, for Appellee.

———————————————

**OPINION**

———————————————

BECKWITH, District Judge.  Defendant Prince raises on appeal three issues challenging his convictions.  Defendant White raises on appeal two issues challenging his convictions and two issues challenging his sentence.

Beginning on or around January 2, 1991, Defendant White devised and engaged in a scheme to "defraud and obtain money by means of false and fraudulent pretenses, representations and promises." Defendant White represented to certain individuals that he was "bonded with" the U.S. Bankruptcy Court and that this enabled him to buy assets involved in bankruptcies which he could then sell for a sizeable profit.  Defendants Prince and White solicited individuals to invest in their alleged plan to purchase and then sell these assets. Investors contributed money for purchasing property and for covering alleged costs associated with purchasing property involved in bankruptcies, *e.g.*, taxes, accountant fees, closing costs, etc.   The government

case. Noticing losses in her report that the victims had not reported previously, Mr. Appleton contacted the victims and requested sworn statements. The sworn statements were consistent with the IRS report except for a few inconsistencies which Mr. Appleton explained. The district court found that the victim impact statements used in the preparation of the presentence investigation report were more accurate than the referenced pieces of testimony. The court noted that the referenced pieces were incomplete and often taken out of context, and that some testimony related to a time midway in the scheme. The court found that the victim impact statements clearly supported a conclusion that the probation officer's calculation of over one million was justified. The court was not clearly erroneous in adopting those calculations.

For the reasons provided above, the judgment of the district court is **AFFIRMED**.

established at trial that individuals could not purchase property from the bankruptcy court as was represented by Defendants.

According to the evidence presented at trial, Defendants physically obtained investors' money through one of three types of arrangements. Under one arrangement, Defendants directed investors to wire transfer the money into the bank accounts of third parties. Per a pre-arranged agreement with either or both Defendants, the third party wrote a check in the amount of the transfer, cashed that check, and then transferred the money in cash to Defendant Prince. On at least a couple of occasions, Prince received a personal check, rather than cash, from the third party. On at least one occasion the third party transferred the cash to another third party who then transferred the cash to Prince. On all occasions Prince eventually transferred the money to White. Prince explained to some investors that money needed to be wired to a third party's account because Prince did not have a bank account and/or that he was in bankruptcy and a monetary transfer would cause the bankruptcy court to attach his account.

Under a second arrangement, Defendants directed investors to wire transfer money via Western Union to third parties. Per a pre-arranged agreement with either or both Defendants, the third party signed for and received the money and then transferred it in cash to Defendant Prince. Prince then transferred to Defendant White the money received from the third parties.

Under a third arrangement, Defendants directed investors to wire transfer money via Western Union to Prince. Prince signed for and received the money from a Western Union representative. Prince then transferred the money to White.

It was not established at trial how Defendants disposed of the money fraudulently obtained. Victims testified that they had not received any of the money they had invested.

On May 18, 1998, a federal grand jury returned a superseding indictment in which Counts 1 through 16 charged

both Defendants with wire fraud and aiding and abetting the commission of wire fraud and Counts 17 through 85 charged both Defendants with money laundering and aiding and abetting the commission of money laundering. A jury trial commenced against Defendants on June 3, 1998. At the close of the government's case, the court entered a judgment of acquittal on Count 33. The jury found Defendants guilty on all remaining counts.

In the interest of economy, we will provide the remaining relevant facts below as we address the issues raised on appeal.

## A. Sufficiency of the Evidence

Defendant Prince contends that the evidence was insufficient to convict him of money laundering.

The standard of review for a claim of insufficient evidence is "whether, taking the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Haun*, 90 F.3d 1096, 1100 (6th Cir. 1996) (citations omitted). A defendant challenging the sufficiency of the evidence "'bears a very heavy burden.'" *United States v. Wright*, 16 F.3d 1429, 1439 (6th Cir. 1994) (citations omitted), *cert. denied*, 512 U.S. 1243, 114 S.Ct. 2759, 129 L.Ed.2d 874 (1994). Circumstantial and direct evidence are afforded the same weight. *United States v. Blakeney*, 942 F.2d 1001, 1010 (6th Cir. 1991) (citations omitted); *United States v. Griffith*, 17 F.3d 865, 872 (6th Cir. 1994) ("'[i]t has long been recognized ... that circumstantial evidence ... can be sufficient to support a jury's determination...'") (quoting *United States v. Scruggs*, 549 F.2d 1097, 1104 (6th Cir.), *cert. denied*, 434 U.S. 824, 98 S.Ct. 70, 54 L.Ed.2d 81 (1977)). We will reverse a judgment for insufficient evidence if, after viewing the record as a whole, we conclude that the judgment is not supported by substantial and competent evidence. *Blakeney*, 942 F.2d at 1010 (citing *United States v. Ellzey*, 874 F.2d 324, 328 (6th Cir. 1989)).

(B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

(2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

(3) all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

(4) any other information specified in the applicable guideline.

USSG § 1B1.3. The sentencing court must base its relevant conduct approximation on reliable information, and the approximation must be supported by a preponderance of the evidence. *Brawner*, 173 F.3d at 971 (citations omitted). Section 2S1.1 of the Sentencing Guidelines prescribes that the sentencing court shall increase the base offense level for money laundering depending on the amount of loss involved.

Defendant White contends that the trial court erroneously adopted the loss calculations computed by Bobby Appleton, the United States Probation Officer who prepared the presentence report. White claims that testimonies at trial establish a figure less than one million. At the sentencing hearing, the government examined Mr. Appleton. He explained that he originally based his loss calculations on a report that he received from an IRS agent investigating the

has failed to illustrate that his is an atypical case "where conduct significantly differs from the norm." Indeed, this scenario is typical, rather than atypical of wire fraud and money laundering schemes.

### 2.   *Value of losses*

For the purpose of sentencing, the district court found that the amount of the loss was more than one million dollars. Defendant White objected to this determination at the time of sentencing and raises this objection now on appeal. The determination of amount of loss is important as section 2S1.1(b) of the Sentencing Guidelines provides for an increase of anywhere from one to thirteen offense levels depending solely on the amount of loss.

We review for clear error a district court's findings of fact in sentencing decisions. *United States v. Gort-DiDonato*, 109 F.3d 318, 320 (6th Cir. 1997); *United States v. Hill*, 79 F.3d 1477, 1481 (6th Cir. 1996) (citing 18 U.S.C. § 3742(e); *United States v. Hamilton*, 929 F.2d 1126, 1130 (6th Cir. 1991)), *cert. denied*, 519 U.S. 858, 117 S.Ct. 158, 136 L.Ed.2d 102 (1996). A finding of fact is clearly erroneous when "'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Gort-DiDonato*, 109 F.3d at 320 (quoting *United States v. Perez*, 871 F.2d 45, 48 (6th Cir. 1989)). We review for clear error a sentencing court's factual findings concerning the amount of loss for which the defendant is to be held accountable as relevant conduct pursuant to Sentencing Guideline section 1B1.3(a)(1). *See United States v. Brawner*, 173 F.3d 966, 971 (6th Cir. 1999) (estimating the loss involved pursuant to the fraud guidelines prescribed in USSG § 2F1.1). Relevant conduct includes:

(1)  (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

Defendant Prince challenges his convictions for money laundering under 18 U.S.C. section 1956(a)(1)(B)(i).[1] The elements of the charged money laundering offenses are:

(1) use of funds that are proceeds of unlawful activity; (2) knowledge that the funds are proceeds of unlawful activity; and (3) conduct or attempt to conduct a financial transaction, knowing that the transaction is designed in whole or in part to disguise the nature, location, source, ownership or control of the proceeds.

*United States v. Moss*, 9 F.3d 543, 551 (6th Cir. 1993).

On appeal, Defendant Prince first asserts that the money obtained through the offense of wire fraud did not become proceeds of unlawful activity as defined in the money laundering statute until he physically obtained the funds of the wire transfer. He concludes that once he obtained these funds, he did not conduct or attempt to conduct a transaction and therefore he did not violate the statute. Second, Prince argues that if a transaction occurred, the proof does not

---

[1] 18 U.S.C. section 1956(a)(1), provides as follows:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity–

(A)(i) with the intent to promote the carrying on of specified unlawful activity; or

(ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or

(B) knowing that the transaction is designed in whole or in part–

(i) to conceal or disguise the nature, the location, the source, the ownership, or the  control of the proceeds of specified unlawful activity; or

(ii) to avoid a transaction reporting requirement under State or Federal law,

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

establish that it was conducted in an attempt to conceal the nature and source of the money. Third, Prince contends that there was "no substantial evidence" to support a conviction of aiding and abetting.[2]

Prince has failed to establish that insufficient evidence supports the three elements of money laundering.

*1.    Use of funds that are proceeds of an unlawful activity*

Under the first element of money laundering, the funds allegedly laundered by Defendant Prince must be the proceeds of an unlawful activity. Specifically, the funds must represent proceeds from some form of activity that constitutes a felony. 18 U.S.C. § 1956 (c)(1). "Proceeds" include "'what is produced by or derived from something (as a sale, investment, levy, business) by way of total revenue.'" *Haun*, 90 F.3d at 1101 (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1807 (1971)).

In this case, the indictment identifies wire fraud as the underlying felony from which the proceeds were derived. The elements of wire fraud, as prescribed under 18 U.S.C. section 1343,[3] are as follows: (1) a scheme or artifice to defraud; (2)

---

[2]18 U.S.C. section 2 provides as follows:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

[3]18 U.S.C. section 1343, provides as follows:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any

---

party for the amount transferred to bank accounts, Defendants instructed the third parties to withdraw the money and transfer cash. This procedure helped prevent any paper trail. As further evidence of the intent to conceal the wire fraud, withdrawals from the bank accounts appeared to be structured so that no withdrawal would amount to $10,000 or more, an amount which would require the bank to complete a cash transaction report. None of the Western Union transfers from the victims identified White as the recipient. Many of the Western Union transfers identified third parties as the recipient. As stated earlier, statements made by Prince suggest an intent to conceal.

Defendant White fails to explain how this case is atypical of the money laundering cases to which Sentencing Guideline section 2S1.1 applies. White contends that the court should have considered the affidavit of Defendant Prince. Prince executed an affidavit prior to the original indictment. In that affidavit, he stated that White was not responsible for the money loss. Contrary to White's argument, the district court did consider the affidavit, and the court concluded that the affidavit was inaccurate, inconsistent with trial testimony, and "clearly not true." Accordingly, the court decided not "to attach much significance" to it.

In addition, White argues that the money wired to third parties went to Defendant Prince and that White had no direct contact with most of the victims. White appears to be arguing that a departure is warranted because insufficient evidence links him to the money laundering charges. However, we disposed of this issue above in addressing his sufficiency of the evidence claim and concluded that the proof at trial established that White initiated and helped perpetuate this fraudulent scheme which evolved into wire fraud and money laundering. At the very least, he aided and abetted the commission of wire fraud and the laundering of the proceeds of that wire fraud. White has failed either to identify a factor that the guidelines did not consider or to show "any unusual circumstances rendering the guidelines' consideration inadequate in [his] case." *See Ford*, 184 F.3d at 586-87. He

range. *United States v. Haun*, 90 F.3d 1096, 1102 (6th Cir. 1996), *cert. denied*, 519 U.S. 1059, 117 S.Ct. 691, 136 L.Ed.2d 614 (1997). After identifying the offense level, the district court adjusts the level as the Guidelines direct and determines the defendant's criminal history category. *Koon*, 518 U.S. at 88, 116 S.Ct. at 2042. (citing United States Sentencing Commission, Guideline Manual § 1B1.1 (Nov. 1992)). The court then coordinates the adjusted offense level and the criminal history category to arrive at the appropriate sentencing range. *Id.* District courts may depart from the applicable Guideline range if "'the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'" *Koon*, 518 U.S. at 92, 116 S.Ct. at 2044 (quoting 18 U.S.C. § 3553(b)). The Introduction to the Guidelines provides:

> The Commission intends the sentencing courts to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted.

*Koon*, 518 U.S. at 93, 116 S.Ct. at 2044 (quoting 1995 U.S.S.G. Ch.1, pt. A, intro. comment. 4(b)).

The trial court did not err in applying the money laundering guidelines to this case. The counts charging Defendant White with wire fraud and money laundering involved substantially the same harm. The court appropriately grouped the two crimes and concluded that the money laundering guidelines applied. As the court found, Defendants structured transactions to avoid a paper trail, concealing their fraudulent activities. Rather than accepting money directly from the victims, Defendants directed victims to transfer money to third parties. Rather than accepting a check from the third

use of interstate wire communications in furtherance of the scheme;[4] and (3) intent to deprive a victim of money or property. *United States v. Merklinger*, 16 F.3d 670, 678 (6th Cir. 1994); *United States v. Ames Sintering Co.*, 927 F.2d 232, 234 (6th Cir. 1990) (citations omitted). Defendants must have used the proceeds of the acts of wire fraud to commit money laundering.

We conclude that the money, once wired by the victims, constituted proceeds of wire fraud. We find instructive the following cases decided in other circuits. *United States v. Savage*, 67 F.3d 1435 (9th Cir. 1995), *cert. denied*, 516 U.S. 1136, 116 S.Ct. 964, 133 L.Ed.2d 885 (1996), supports the proposition that Prince did not need to have physical possession of the money before it could be considered proceeds. In *Savage*, the defendant was convicted of various offenses including wire fraud and money laundering. *Id.* at 1437. The defendant defrauded individuals by promising that if they sent him $5,000, he would obtain foreign loans and earn each investor a return of $10 million. *Id.* The defendant recruited assistants to help him raise money, transfer it, and launder it. *Id.* at 1438. The assistant would direct investors to send money to the assistant's bank account. *Id.* In some of these transactions, the assistant transferred that money to a foreign bank account; at that point, the money either was sent back to the defendant's personal accounts in the United States or was used directly to pay the defendant's expenses. *Id.*

---

writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than five years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

[4] The defendant does not have to directly or personally perform the wire communication; it is sufficient that it is foreseeable that a wire communication could be used to advance the scheme to defraud. *United States v. Griffith*, 17 F.3d 865, 874 (6th Cir. 1994) (citing *United States v. Campbell*, 845 F.2d 1374, 1382 (6th Cir.), *cert. denied* 488 U.S. 908, 109 S.Ct. 259, 102 L.Ed.2d 248 (1988)).

On appeal, the defendant in *Savage* contended that the international monetary transfers did not involve proceeds of unlawful activity as defined in section 1956. *Id.* at 1441-42. However, the Ninth Circuit concluded that the international monetary transfers did involve the proceeds of the previous acts of wire fraud. *Id.* at 1442. In appealing his convictions on 18 U.S.C. section 1957 offenses,[5] the defendant argued that he did not have possession of the money when the wire transfers were sent because the money was not transferred out of his personal account. *Id.* The court held that the funds transferred were criminally derived property at the time they were deposited in accounts under the defendant's control. *Id.* at 1443. The court found that the funds were at the defendant's disposal because the record indicated that the parties named on the accounts transferred the money at the defendant's request. *Id.* The court stated that it was irrelevant that the accounts were not in the defendant's name. *Id.*

A case in the Fourth Circuit also supports the proposition that funds may constitute proceeds even though the defendant is not at that point in physical possession of those funds. In *United States v. Smith*, 44 F.3d 1259, 1263 (4th Cir. 1995), the defendants Smith, Grimm, and Palmer were convicted of wire fraud in violation of 18 U.S.C. section 1343 and money laundering in violation of 18 U.S.C. section 1957. Smith and Grimm carried out a scheme in which they fraudulently

---

[5] 18 U.S.C. section 1957 prohibits anyone from "knowingly engag[ing] or attempt[ing] to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity." This statute does not require that the defendant knew that the offense from which the criminally derived property was derived was specified unlawful activity. 18 U.S.C. § 1957(c). Section 1957(f)(2) defines criminally derived property as "any property constituting, or derived from, proceeds obtained from a criminal offense."

Stating that the legislative history applicable to section 1956 also applies to section 1957, the Ninth Circuit in *Savage* concluded that "criminally derived property" under section 1957 is equivalent to "proceeds" under section 1956. *Savage*, 67 F.3d at 1442.

---

original plan and used for the defendants' own personal benefit. At least for their own uses.

Also, we have a case here where the defendants were going to great lengths to avoid a paper trail. I don't buy the argument that bank accounts weren't possible in this case because somebody was in bankruptcy. You can have a – you can have a checking account while you're in bankruptcy. People do it all the time. It's clear in this case that other people's bank accounts were being used, wires were being used in an effort to avoid a record or a trail of this money. So it seems to me that the circumstances of this case are far closer to *Ghosheh* than they are to *Caba*.

Even though it's a difficult question, it's my conclusion that the money laundering statute is the appropriate guideline to use as the starting point for the calculations in this case.

(JA at 1059-62).

While the district judge did not refer to his authority under the guidelines to exercise discretion in deciding whether to depart, we do not require him to state that he has this discretion. We conclude that the district judge did exercise his discretion in refusing to downward depart. Even if the district judge presumed himself bound by precedent and precluded from granting the requested departure, the result was correct because the facts of this case are not outside the heartland of the guidelines' considerations.

A district court, applying the Sentencing Guidelines, identifies the base level offense assigned to the crime. *Koon v. United States*, 518 U.S. 81, 88, 116 S.Ct. 2035, 2042, 135 L.Ed.2d 392 (1996) (citing United States Sentencing Commission, Guideline Manual § 1B1.1 (Nov. 1992)). The court must group together into a single group all counts involving substantially the same harm. United States Sentencing Commission, *Guidelines Manual* § 3D1.2 (Nov. 1998). Under the grouping rules, the offense guideline that gives rise to the highest offense level dictates the sentencing

I have to decide whether or not money laundering is the appropriate guideline to use as a starting point. And I have read – while Ms. Ferguson was discussing it, I have read the opinion in the *Ghosheh* – that's G-H-O-S-H-E-H – from the Sixth Circuit, and the Court of Appeals for our circuit used the following language in the *Ghosheh* case. The Court of Appeals said that 'The defendant in *Caba*, unlike the defendant in the instant case' – that is, the *Ghosheh* case – 'was redeeming food stamps that actually had been used to purchase food. Thus, in *Caba*, the court properly could conclude that the purpose for which the stamps had been intended – to purchase foodstuffs – was not defeated by the defendant's actions.

'Here, on the other hand, the food stamps redeemed by the defendant were never used for their actual purpose. This led to a complete diversion of government funds, which passed directly to the defendant, without ever having been used by those for whose benefit the food stamps had been issued. The defendant, moreover, does not refute the government's contention that he went to great lengths to conceal his deposits and withdrawals, used multiple bank accounts in the name of nominees, and usually closed bank accounts after a short period of time. Thus, defendant's actions are much closer to the heartland of the money laundering statute because those actions manifest a desire on his part to conceal the source, flow and destination of unlawfully obtained funds.

'Because the defendant's conduct here is readily distinguishable from that of the defendant in *Caba*, that case does not support, much less require, reversal of the district court's sentence in this case.'

It seems to me that the *Ghosheh* opinion lends support for the proposition that the defendant in this case was, in fact, closer to money laundering than the defendant was in *Caba*. In this case, the money was diverted from the purpose for which it was sent. The victims sent the money thinking that they were engaging in a financial investment plan through the bankruptcy court. That was never the case. The money was diverted from that

induced lenders to advance money to Lagusa, Inc., for the stated purpose of financing a corporation controlled by Smith. *Id.* at 1262-63. Lagusa's president, Palmer, in exchange for kickbacks, transferred the loans to an account controlled by Smith, who later withdrew the money. *Id.* at 1263.

On appeal, Smith argued that the money transfers from Lagusa to the bank account controlled by him could not constitute both wire fraud and transactions in criminally derived property. *Id.* The Fourth Circuit concluded that when Smith and Grimm fraudulently induced the lenders to wire loan proceeds to Lagusa, the wire fraud offenses were completed. *Id.* at 1265. Thus, at that point, the money in the hands of Lagusa constituted proceeds from unlawful activity, despite the fact that the wire fraud scheme included further transactions. *Id.*

Smith also argued that when Lagusa received the proceeds of the fraudulently obtained loans, Smith neither possessed nor controlled these loans and thus he could not be charged with money laundering. *Id.* In rejecting this argument, the Fourth Circuit held that the transfer from the lenders to Lagusa was effected pursuant to a scheme to defraud, which Smith participated in and devised. *Id.* at 1266. Smith was in constructive control of the entire scheme and was therefore in constructive possession and control of the fraudulently procured funds at the time those funds were transferred in violation of the money laundering statute. *Id.* Further, the appellate court held that as Smith was charged with aiding and abetting, he would not be required to be in possession of the money as it was being laundered. *Id.*

A Fifth Circuit case, *United States v. Leahy*, 82 F.3d 624 (5th Cir. 1996), is instructive on the proposition that a defendant needs only sufficient control, not actual, physical possession, of the funds. In *Leahy*, the defendants Leahy, Nece, and Flanagan were convicted of offenses including wire fraud in violation of 18 U.S.C. section 1343 and money laundering in violation of 18 U.S.C. section 1957. *Id.* at 629.

Nece owned and operated Great Western Roofing ("GWR"), which successfully bid on a project for a Veterans Administration ("the VA") building. *Id.* at 628. Because of GWR's poor record of paying two of its main suppliers, those suppliers insisted that GWR establish an escrow account. *Id.* The escrow agreement required the escrow agent to transfer the money paid by the VA, to GWR and the two suppliers, according to set percentages. *Id.* Approximately six weeks after receiving instructions to begin the project, GWR presented fraudulent invoices to the VA and requested approximately half of the contract price. *Id.* Unaware of the fraud, the VA wired the requested money to the escrow account. *Id.* As per the escrow agreement, the escrow agent transferred the money to GWR and the two suppliers. *Id.* On appeal of his conviction, Leahy argued that GWR did not possess the funds wired from the VA until they were deposited in GWR's account. *Id.* at 635. Thus, according to Leahy, the wire fraud was not complete until that point, and therefore, the transfer of funds from the escrow account to GWR's account did not involve criminally derived proceeds. *Id.* Noting that the escrow agent had no discretion as to how to distribute the funds, the court found that GWR had sufficient control over the escrow account and thus wire fraud was complete when the money was deposited in the escrow account. *Id.* at 635-36. The subsequent transfers involved illegally obtained proceeds. *Id.* at 636. In so finding, the court noted that the Ninth Circuit in *Savage* upheld a section 1957 conviction even though funds had not been transferred to the defendant's account because the "'funds were clearly at Savage's disposal at the time of the deposit–the record indicates that the parties named on the accounts transferred the money at his request.'" *Id.* at 636 (quoting *Savage*, 67 F.3d at 1443).

In the present case, Defendants had sufficient control over the funds wired to Prince as well as the funds wired to third parties. In the instances in which victims transferred money to Prince directly, once the victims wired the money, it constituted proceeds. The same is true when victims transferred money to a third party because Prince had

downward is considered an issue of Guidelines interpretation that we review *de novo*. *Ebolum*, 72 F.3d at 37 (citations omitted). We examine the sentencing hearing transcript to determine whether the district court's refusal to depart downward was an exercise of discretion or a legal determination that it lacked the authority to depart. *Ebolum*, 72 F.3d at 37. The district court judge has no duty to state affirmatively that he knows he possesses the power to depart downward but declines to do so. *United States v. Byrd*, 53 F.3d 144, 145 (6th Cir. 1995). When reviewing a ruling which fails to affirmatively state that the judge knew he could depart downward, "it should be assumed 'that the court, in the exercise of its discretion, found downward departure unwarranted.'" *Id.* (quoting *United States v. Barrera-Barron*, 996 F.2d 244, 245 (10th Cir.), *cert. denied*, 510 U.S. 937, 114 S.Ct. 358, 126 L.Ed.2d 321 (1993)).

At the sentencing hearing both Prince and White articulated objections to the use of the money laundering guidelines. The court entertained arguments from both defendants on the issue of whether the wire fraud or money laundering guidelines should apply. In ruling on the issue, the court explained its role in sentencing:

> \*            \*            \*

> the guidelines say that in a case such as this, under normal circumstances you use the guideline for the most serious offense. In this case, that would be money laundering.
> But that's not always the case because it could be that there are cases in which a defendant is technically convicted of money laundering, but the real substance of his crime was wire fraud. In that case – Such as the *Caba* case that was cited by Mr. Ferguson. In that case, even though there was a technical violation of the money laundering statute, the guideline for wire fraud more closely approximated the defendant's conduct.
> But our circuit had an opportunity to address the *Caba* case. And it's true that the defendant was guilty of both.

that, at the very least, White aided in the commission of wire fraud and the money laundering that occurred with the proceeds of the wire fraud. White has failed to sustain his "very heavy burden" that no rational trier of fact could have convicted him.

## F.   Sentencing

The district court sentenced Defendant White under the money laundering guidelines, United States Sentencing Guideline 2S1.1 (a)(2). The base offense level under these guidelines is 20, and the court, finding the value of the funds involved as more than $1,000,000, added five levels pursuant to U.S.S.G. 2S1.1(b)(2)(F). The court used a level of twenty-five and a criminal history category of II. Imposing a sentence at the maximum end of the guidelines, the court sentenced White to 60 months for the wire fraud counts and 78 months for the money laundering counts to be served concurrently. White filed an objection to the pre-sentence report contesting the use of the money laundering guidelines, as opposed to the wire fraud guidelines, and contesting the calculation of loss. White articulated these objections at the sentencing hearing as well. On appeal, White raises both these issues.

### 1.   *Sentencing under the money laundering guidelines*

Ordinarily, a defendant may not appeal a district court's discretionary decision not to depart downward from the range provided in the Sentencing Guidelines. *United States v. Ebolum*, 72 F.3d 35, 37 (6th Cir. 1995) (citations omitted). However, a defendant may appeal when the district court believed that it lacked authority to depart downward as a matter of law. *Id.* (citing *United States v. Landers*, 39 F.3d 643, 649 (6th Cir. 1994); *United States v. Dellinger*, 986 F.2d 1042, 1044 (6th Cir. 1993)). If the court's refusal to depart stemmed from its legal conclusion that the circumstance argued by the defendant was not a valid reason for departure, the decision is reviewable. *United States v. Ford*, 184 F.3d 566, 585 (6th Cir. 1999) (citations omitted). The district court's determination that it lacked authority to depart

sufficient control over that money. In every case in which money was transferred to a third party, the third party was someone with whom Prince had a relationship. Prince solicited the help of his sister, his brother, a niece, two sister-in-laws, his accountant, two of his employees, and an individual who Prince had known his whole life. Prince had reached a prior agreement with each of them in which the third party had agreed to transfer the money to Prince. On all occasions, the third party complied. On all occasions, whether the victim transferred the money to a third party or Prince, Prince transferred the money to White. The Defendants devised, participated in, and were in constructive control of this elaborate scheme.

Even if, *arguendo*, the money did not constitute proceeds until the money was in Prince's hands, Prince fails to satisfy his burden on his claim of insufficient evidence. As is addressed below, Defendants conducted transactions after Prince had physical possession of the proceeds. Evidence established that Prince transferred each payment or contribution to White. Sufficient evidence supports the first element of money laundering.

### 2.   *Knowledge that the funds are proceeds of unlawful activity*

Prince does not argue that this element was not supported by sufficient evidence.

### 3.   *Conduct or attempt to conduct a financial transaction knowing that the transaction is designed in whole or in part to disguise the nature, location, source, ownership, or control of the proceeds*

On appeal, Defendant Prince argues that the government failed to present any proof of a subsequent financial transaction designed to conceal the nature of the funds. The term "financial transaction" means

(A) a transaction which in any way or degree affects interstate or foreign commerce (i) involving the

movement of funds by wire or other means or (ii) involving one or more monetary instruments, or (iii) involving the transfer of title to any real property, vehicle, vessel, or aircraft, or (B) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree;

18 U.S.C. § 1956 (c)(4).

The term "transaction"

includes a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition, and with respect to a financial institution includes a deposit, withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of any stock, bond, certificate of deposit, or other monetary instrument, use of a safe deposit box, or any other payment, transfer, or delivery by, through, or to a financial institution, by whatever means effected;

18 U.S.C. § 1956 (c)(3).

The term "monetary instruments" means

(i) coin or currency of the United States or of any other country, travelers' checks, personal checks, bank checks, and money orders, or (ii) investment securities or negotiable instruments, in bearer form or otherwise in such form that title thereto passes upon delivery;

18 U.S.C. § 1956 (c)(5).

In the present case, Defendant Prince, in violation of the wire fraud statute, induced victims to wire money. The subsequent transactions involving the proceeds of wire fraud constitute financial transactions as defined in section 1956. In the first of the three types of arrangements, Prince directed the victims to wire money to the bank accounts of third parties. He typically directed the third party to either

property through the bankruptcy courts. Prince testified that White instructed him on the amounts of money to request from the victims. Prince transferred all of the money he fraudulently received to White. Defendant Prince sent to White, via Western Union, the following: (1) $1,250 on April 22, 1993; (2) $1,000 on May 25, 1993; (3) $2,455 on May 29, 1993; (4) $2,000 on July 9, 1993; (5) $1,000 on December 17, 1993; (6) $350 on October 30, 1994; (7) $395 on December 2, 1994.

George Stevenson, a Chapter 7 and 13 Bankruptcy trustee in the Western District of Tennessee, testified that he did not know either defendant and that the bankruptcy court offered no plan whereby an individual could purchase property from the bankruptcy court at a cheap rate. On the issue of sufficiency of evidence, White argues that (1) only Max Osborne, Debra Gates, and Robert Howard gave White money directly; (2) money wired into the accounts of third parties was always given to Prince; (3) there is no indication that White received the money involved in the money laundering counts; (4) Mrs. Bell gave to Prince the cashier's check offered to Mr. Stephens during White's state criminal proceeding; and (5) there was no substantial evidence that White committed wire fraud in his dealings with Mr. Crawley and Mr. Stephens.

Sufficient circumstantial and direct evidence has established that White initiated and, at the very least, helped perpetuate this fraudulent investment scheme which evolved into wire fraud and into the laundering of the proceeds of that fraud. While some of the victims directly tied to White might not have been victims of the wire fraud or the money laundering, the evidence of the fraud perpetrated against them by White connects him to the overall scheme and provides circumstantial evidence of his involvement in the wire fraud and money laundering offenses. The testimonies of Defendant Prince, his wife, and some of the victims of the wire fraud establish that White remained an active participant when the scheme evolved into acts of wire fraud and money laundering. Substantial and competent evidence established

When Prince stated that there was no way that he could reach White, Mr. Dieruf, Jr. stated that he would not contribute any more money. Ten minutes later, White phoned Mr. Dieruf, Jr. and assured him that there would be no future requests for money and that, if Mr. Dieruf, Jr. would send the requested money, White would personally guarantee that in twenty days the investors would receive half of their money back. During Mr. Dieruf, Jr.'s involvement in the scheme, he wire transferred money to the bank accounts of third parties including Dorothy Hamby, Roxanna Hawes, Chris Mathis, Gene Gordon Auto Sales, Kelly Barber, and Gene Gordon. Mr. Dieruf, Jr. also transferred money via Western Union to Prince.

Defendant Prince contacted William Dieruf, III about investing in the plan. Prince explained to Mr. Dieruf, III that, through Defendant White, Prince had a special arrangement with the bankruptcy court whereby he could pay cash to buy bankrupt companies. Per Prince's instructions, Mr. Dieruf, III wire transferred money to the bank accounts of Chris Mathis and Dorothy Hamby.

According to Joan Howard, Defendant Prince informed her that the money that she and her husband transferred to Mrs. Bell's bank account or sent via Western Union was going to be received by Prince who was to give it to White. Ms. Howard and her husband also transferred money to the bank accounts of third parties including Wayne Prince, Ruby Prince and Kelly Barber.

Virginia Prince, Defendant Prince's wife, testified that when her husband received money he would give that money either to White or to an individual who was instructed to give the money to White. She witnessed her husband deliver some of the money to White. Her husband informed her that the money was "going to Tony White." White discussed the "plan" with Virginia Prince as well as others. Virginia Prince was present when White talked to Mrs. Bell about the plan.

Defendant Prince testified that Max Osborne and White asked Prince if he wanted to get involved in their plan to buy

withdraw money from the bank account or write a check on that account and cash that check. Then, the third party would transfer the cash to Prince. The act of withdrawing the money from the bank account constitutes a transaction, specifically a withdrawal, involving the use of a financial institution. The act of transferring cash from the third party to Prince is a transaction as defined in section (c)(3) in that it is a transfer or disposition[6] of a monetary instrument, *i.e.*, cash. Likewise, on those few occasions when the third party wrote Prince a check, that constituted a transfer or disposition of a monetary instrument, *i.e.*, a personal check. Prince caused two transactions to be conducted -- one between the third party and the bank and one between the third party and Prince . *See United States v. Cavalier*, 17 F.3d 90 (5th Cir. 1994).[7] Upon completion of the transactions or dispositions, Prince then transferred the funds to White. This constitutes yet another disposition of the proceeds of wire fraud.

Under the second type of arrangement, Defendant Prince instructed victims to wire money to third parties via Western

---

[6] A disposition means "'a placing elsewhere, a giving over to the care or possession of another.'" *United States v. Garcia Abrego*, 141 F.3d 142, 161 (5th Cir. 1998) (citations omitted).

[7] In *United States v. Cavalier*, 17 F.3d 90, 91 (5th Cir. 1994), the defendant had possession of a van that was insured by Allstate Insurance Corporation ("Allstate") and financed by General Motors Acceptance Corporation ("GMAC"). The defendant shipped the vehicle to Honduras where it was sold, and then he reported to Allstate that it had been stolen. *Id.* Based on the mailed, false theft report, Allstate paid GMAC to satisfy the lien on the van. *Id.* The indictment charged the defendant, among other offenses, with causing the conducting of a financial transaction involving the proceeds of mail fraud, in violation of 18 U.S.C. sections 1956(a)(1)(A)(i); 2. *Id.* On appeal of his guilty plea, the defendant argued that he did not cause a financial transaction between Allstate and GMAC to be conducted because he had no dominion or control over Allstate. *Id.* at 92. The Fifth Circuit found that the mailing of the false theft claim to Allstate caused Allstate to send a check to GMAC, thereby extinguishing GMAC's lien. *Id.* The court "therefore reject[ed] the argument that [the defendant] did not cause to be conducted a financial transaction between Allstate and GMAC." *Id.*

Union. Prince effected a disposition or transfer by directing the third party, who had been instructed to retrieve the money from Western Union, to transfer the cash to him. Through such conduct, Prince has effected a disposition of the proceeds of the wire fraud. *See United States v. Reed*, 77 F.3d 139, 143 (6th Cir. 1996) (en banc) (overruling *United States v. Oleson*, 44 F.3d 381 (6th Cir. 1995) and *United States v. Samour*, 9 F.3d 531 (6th Cir. 1993) to the extent that those cases held that the conduct of delivering drug proceeds or money intended to purchase drugs to a courier did not constitute a financial transaction under section 1956). In *United States v. Baez*, 87 F.3d 805, 810 (6th Cir. 1996), we held that the following facts as provided in the plea agreement constituted a "financial transaction" in violation of 18 U.S.C. section 1956(a): "Baez violated the money laundering statute when he sent another individual from New Jersey to Ohio for the purpose of picking up approximately $349,417.00 in drug trafficking proceeds and delivering the money to a place outside the state of Ohio."

Upon completion of the transaction or disposition from the third party to Prince, Prince then transferred the funds to White. This constitutes a second disposition of the proceeds of wire fraud.

Under the third type of arrangement, Defendant Prince instructed victims to transfer money to him via Western Union. Prince testified that all of the money that victims transferred to him he transferred to Defendant White. This delivery of the wire fraud proceeds to White constitutes a financial transaction.

Defendant Prince contends that no evidence supports the allegation that he conducted the transactions in an attempt to conceal the funds. The evidence presented suggests that Prince, at the very least, aided in a scheme in which there was an attempt to conceal the true owner and controller of funds. *See United States v. Elder*, 90 F.3d 1110, 1125 (6th Cir.), *cert. denied*, 519 U.S. 1016, 117 S.Ct. 529, 136 L.Ed.2d 415 (1996).

balked, but White convinced him to contribute money by offering to write Mr. Stephens a check to assure him that White was not "going to beat" Mr. Stephens. Each time he gave White money, White would write Mr. Stephens a check. At one point, Mr. Stephens attempted to cash the checks, and the bank refused to honor them. Mr. Stephens approached the district attorney, and eventually, state criminal charges were brought against White. At some point during those criminal proceedings, Defendant Prince approached Mr. Stephens and offered him a check for the money owed him. Mr. Stephens tried unsuccessfully to cash the check.

Mrs. Bell, Defendant Prince's sister, testified that both Defendants approached her about investing money in their plan. Mrs. Bell admitted that she and her husband had given a lot of money to Prince and White. When other victims of the scheme would transfer money to her bank account, Mrs. Bell would write a check on that account in order to withdraw money and give cash to Prince. Mrs. Bell would receive Western Union wire transfers and transfer the cash to Prince. On one occasion, Mrs. Bell picked up money wire transferred into Roxanna Hawes' account and delivered it to Prince. Mrs. Bell recalled an occasion in which she accompanied Prince to Kentucky to retrieve money from Robert Howard, a victim in this scheme. Mrs. Bell witnessed Prince transfer that money to White. In response to Mrs. Bell's, request, her daughter, Debra Gates, gave $6,500 in cash directly to White.

Mr. William Dieruf, Jr., was introduced to Defendant Prince who convinced Mr. Dieruf, Jr. to invest in a plan to purchase assets of bankruptcy estates with a substantial projected profit. At one point, Mr. Dieruf, Jr. refused to give Prince $17,900 that Mr. Dieruf, Jr. had collected for the investment plan. In response, Prince arranged for Defendant White to call Mr. Dieruf, Jr. During the course of the approximately twenty minute conversation, White stated that he was in charge and that Mr. Dieruf, Jr. could have confidence that the investment plan would proceed as discussed. The next day, Mr. Dieruf, Jr. informed Prince that he would not send the money until he talked to White again.

the bankruptcy court, he could purchase this property. Max Osborne, Ruth Osborne's husband, also testified that White claimed he was "bonded to buy property through the bankruptcy court." White drove Mr. Osborne to pieces of property that White claimed were assets in a bankruptcy and would be sold at a reasonable price. White suggested that a profit could be made by purchasing, "fixing up", and then renting the properties. White quoted prices for purchasing the properties. Based on the representations White made about his relationship with the bankruptcy court, Mr. Osborne gave White money for over two years. Mr. Osborne gave checks and sometimes cash directly to White. Mr. Osborne believed he was buying property. White was in Defendant Prince's store at the time that Prince met with Mr. and Mrs. Osborne there to re-assure them that the plan was legitimate. When Mr. and Mrs. Osborne requested that White return their money, White reassured them that they would get back their approximately $228,000 investment. They never received any money.

White approached Clarence Crawley with an alleged plan to purchase property in bankruptcy and then sell it, doubling Mr. Crawley's investment. White signed a promissory note stating that Mr. Crawley had given White $7,300 and that he would pay Mr. Crawley $16,000. Per White's instructions, Mr. Crawley gave White $5,300 in cash and a cashier's check for $2,000 payable to "Chapter 13 BC court." At some point, White gave Mr. Crawley a check for him to hold and to cash in the event that he grew concerned that White would not return the money. Some months later, Mr. Crawley took the check to the bank and discovered that no bank account corresponded to the number on the check. When Mr. Crawley approached White about getting the money back, White drafted a signed and notarized agreement which detailed a repayment plan.

White introduced Silas Stephens to the scheme. Claiming to have a special relationship with the bankruptcy court, White claimed that he could purchase, for a cheap price, cars impounded by the bankruptcy court. At first, Mr. Stephens

On some occasions, Prince directed victims to contribute money to the scheme through a third party. This arrangement involved explaining the use of a third party to the potential investor, soliciting the assistance of a trusted third party, requiring the third party to go to their bank or to a Western Union office to obtain the money, effecting the transfer to Prince, and then arranging the transfer from Prince to White. This elaborate arrangement protected Defendants from a potential paper trail. Prince usually instructed the third parties to whom money had been transferred, to give him cash. Mrs. Bell, Prince's sister, testified that Prince requested that he receive the money in cash.[8] At times, these instructions required the third parties to go to their bank and withdraw the money rather than simply writing a check payable to Prince, White, or the bankruptcy court for which the money was allegedly collected. Again, this prevented a paper trail.

The government presented testimony which suggested that Prince structured transactions so that a third party would never withdraw more than $10,000 from their bank account in one transaction. Chris Mathis, one of these third parties as well as Prince's accountant, testified that a transaction in excess of $10,000 would require the bank to send a cash

---

[8] The following is an excerpt from the government's direct examination of Mrs. Bell:

Q    And then why wouldn't you write a check out of your account to give it to your brother instead of giving him cash?

A    Why would I – Well, see, I did give him cash.

Q    I know. Why did you give him the cash?

A    Well, that's the way they wanted it. They wanted it in cash.

Q    Did they ever give you a receipt, Ms. Bell?

A    I did not get any sort of receipt for it.

(Joint Appendix at 464).

transaction report to the Internal Revenue Service. Mrs. Bell, one of the third parties and Prince's sister, testified that on one occasion where she gave Prince $19,000, she wrote two separate checks, each for $9,500, so that the transaction would not be reported. On one occasion, $10,700 was wire transferred to Chris Mathis' account, but to withdraw the money, Mr. Mathis wrote two checks, one for $700 and one for $10,000.

The few Western Union transfers sent by victims which identified Prince as the recipient still helped conceal, as they did not identify White who, as Prince testified, was the final recipient of the proceeds of all of the transfers. By directing the transfers to himself, Prince aided White by concealing the fact that White was the true controller of the proceeds of this scheme. During the sentencing hearing, the district court found that it was "clear in this case that other people's bank accounts were being used, wires were being used in an effort to avoid a record or a trail of this money."

The government elicited testimony that Prince, on at least two occasions, stated that due to the structure of the transactions it could not be proven that he received money.[9]

---

[9]The following is an excerpt from the government's direct examination of Mr. William C. Dieruf, Jr., who was a victim in this case:

Q   Did [Defendant Prince] ever make a statement to you, sir, to the effect that you couldn't prove that you sent money to him?

A   Several times he said there's nobody can prove that he had ever received any money, period.

(Joint Appendix at 599).

Prince arranged for money to be wire transferred to Chris Mathis' account, and Mr. Mathis withdrew the cash and gave it to Prince. The following is an excerpt from the government's direct examination of Mr. Mathis:

Q   Did you talk to him about talking to the investigators? Did you tell him you talked to the investigators in this case?

In his motion, White argued that (1) he did not have adequate time to consult with his attorney; (2) the government had not produced adequate discovery, *i.e.*, the endorsement on the cashier's check attached as an exhibit to the above-referenced Rule 404(b) motion and certain information concerning a civil lawsuit filed by Clarence Crawley; and (3) he would not have time to produce this evidence. More specifically, White complained that he did not have adequate time to produce records illustrating that the check made payable to "Chapter 13 BC Court" for $2,000 did go to the court for the reinstatement of his bankruptcy.

Not only did the superseding indictment only add an additional overt act to the overall scheme to defraud, as opposed to adding a new charge, but the superseding indictment only added the act of defrauding Mr. Crawley, an act which was revealed in the government's motion filed April 3, 1998. That motion alerted Defendant to the allegations surrounding Mr. Crawley and to the fact that the government intended to introduce at trial those four documents which supported a claim of fraud perpetrated against Mr. Crawley. White had adequate time to consult with his attorney and to prepare his defense.

White has failed to establish that the district court's denial of White's motion for continuance was so arbitrary as to violate due process.

### E.   Sufficiency of the Evidence

Defendant White contends that the evidence was insufficient to convict him of wire fraud, money laundering, and aiding and abetting. We review a sufficiency of the evidence claim as articulated above in Section **A**.

Evidence established that White, at the very least, aided in the overall scheme to defraud from which arose the acts constituting wire fraud and money laundering. Ruth Osborne testified that she and her husband gave White money so that he could purchase property from the bankruptcy court. White assured Mrs. Osborne that, because he was bonded through

*v. Gallo*, 763 F.2d 1504, 1523 (6th Cir. 1985) (quoting *United States v. Mitchell*, 744 F.2d 701, 704 (9th Cir. 1984)), *cert. denied*, 474 U.S. 1068, 106 S.Ct. 826, 88 L.Ed.2d 798 (1986). "'Broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel.'" *Frost*, 914 F.2d at 765 (citations omitted). We do not apply any mechanical tests for determining when a denial of a request for continuance is so arbitrary as to violate due process. *Frost*, 914 F.2d at 765 (citations omitted). Rather, we consider the circumstances present in the case, particularly the reasons presented to the trial court at the time of the request. *Id.* "'[W]e look for a showing from the defendant of prejudice, *i.e.*, a showing that the continuance would have made relevant witnesses available, or would have added something to the defense.'" *Frost*, 914 F.2d at 765 (citations omitted).

18 U.S.C. section 3161 (c)(2) provides as follows: "[u]nless the defendant consents in writing to the contrary, the trial shall not commence less than thirty days from the date on which the defendant first appears through counsel or expressly waives counsel and elects to proceed pro se." The Supreme Court has held that this 30-day trial preparation period does not commence from the date of filing of a superseding indictment as "[t]he statute clearly fixes the beginning point for the trial preparation period as the first appearance through counsel." *United States v. Rojas-Contreras*, 474 U.S. 231, 234, 106 S.Ct. 555, 557, 88 L.Ed.2d 537 (1985). Thus, a defendant is not automatically entitled to a thirty-day continuance upon the filing of a superseding indictment. The district court has the authority, under 18 U.S.C. section 3161(h)(8), to grant a continuance if the "'ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial.'" *Id*. at 236, 106 S.Ct. at 558.

Defendant White has failed to establish that the trial court abused its discretion in denying his motion for continuance.

One witness, who on two occasions had received money in her account and transferred it to Prince, testified that Prince called her and told her the IRS was auditing the bank and instructed her not to mention his name. The structuring of the transactions combined with Prince's statements adequately support the theory that Prince, at the very least, aided in a scheme involving transactions conducted in an attempt to conceal the proceeds of wire fraud.

On the issue of sufficiency of the evidence on the money laundering counts, we hold that Prince has failed to satisfy his very heavy burden.

---

A    Yes, sir.

Q    What was his reaction to that?

A    I can't remember any specific reaction other than he didn't like the folks that were doing the investigating, maybe. Although, I believe at the time they hadn't talked to him.

Q    Didn't he tell you that he didn't want you telling them that he got the money?

A    He might have said that; yes.

Q    Also told you that they were trying to stir up trouble, didn't he?

A    Yes, sir.

Q    Now, did he also make the statement that no one could prove that he had got the money?

A    Yes. But all along I told him I was going to tell exactly what happened to the money.

Q    But he told you that no one could prove he got the money.

A    Yes, sir.

(Joint Appendix at 715-16).

## B.    Constructive Amendment of the Indictment

Defendant Prince contends that the district court's instructions on money laundering combined with the evidence at trial constituted a constructive amendment to the indictment.  Count seventeen of the indictment provides as follows:

On or about March 10, 1995, in the Western District of Tennessee, the defendants, being aided and abetted, counseled and induced by the other, did knowingly and wilfully conduct and attempt to conduct a financial transaction which involved the proceeds of a specified unlawful activity, to wit, wire fraud, in violation of Title 18, United States Code, Section 1343, said activity being punishable under the laws of the United States, knowing that the transaction was designed to conceal and disguise the nature, the location, the source, the ownership, and the control of the specified unlawful activity, and that while conducting and attempting to conduct such financial transactions knew the property involved in the financial transaction, to wit, a $13,750.00 cash transfer, represented the proceeds of some form of unlawful activity, all in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i) and Section 2.

(Joint Appendix at 64).  Counts eighteen through eighty-five reallege the allegations presented in Count seventeen except for the dates and amounts, which the indictment then enumerates.  The district court charged the jury, in pertinent part, as follows:

The crimes alleged in counts 17 through 32 and 34 through 85 are commonly called money laundering. Each of those counts charge defendants with a separate violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).  Each of those counts allege – each of those counts alleges a specific violation on the date alleged and in the amount alleged.  You must consider each count separately and return a separate verdict on each count.

following four documents: (1) copy of a promissory note written to Clarence Crawley signed by White; (2) copy of a money order receipt purchased by Clarence Crawley and payable to "Chapter 13 BC Court"; (3) copy of a check for $7,300 payable to Clarence Crawley signed by White; and (4) copy of a notarized agreement between Clarence Crawley and White, dated April 2, 1993, directing White to pay Mr. Crawley $13,500.  The court considered the "motion" to be the notice that is mandated by Rule 404(b), and, to the extent that the motion requested a pre-trial determination that the evidence would be admissible under Rule 404(b), the court denied the motion. On May 18, 1998, the grand jury returned a superseding indictment which added paragraph three to Count 1.  Paragraph three charged that

It was further a part of the aforesaid scheme and artifice to defraud and obtain money by means of false pretenses and representations and promises that **TONY WHITE** approached Clarence L. Crawley in August of 1992 with the aforementioned scheme and artifice to defraud and persuaded Clarence F. [*sic*] Crawley to invest approximately $8,500.00 in furtherance of the scheme.

The court arraigned White on May 28, 1998.  On May 29, 1998, White moved for a dismissal of the superseding indictment or for a continuance of the trial date of June 3, 1998.  The court denied this motion, stating that the superseding indictment did not make a material change to the charges as it added only one additional overt act. Further, the court rejected White's argument that he needed additional time to investigate, finding that White had been aware of the accusation involving Mr. Crawley since the government filed its motion in limine on April 3, 1998.

We review for abuse of discretion matters within the discretion of the district court. *United States v. Frost*, 914 F.2d 756, 764 (6th Cir. 1990).  Granting or denying a continuance is a matter within the discretion of the court. *Id.* at 765.  We will not reverse a denial of a motion for a continuance absent a clear abuse of discretion. *United States*

evidence that Defendant, despite a strong suspicion, closed his eyes for fear of what he would learn.

Defendant contends that the court erred in failing to instruct the jury that "'carelessness or negligence or foolishness'" is insufficient. We have upheld a jury instruction which stated that the element of knowledge may be inferred from evidence that the defendants "'acted with a reckless disregard for the truth or with a conscious purpose to avoid learning the truth about the unlawful transaction involving the checks.'" *United States v. Gullett*, 713 F.2d 1203, 1212 (6th Cir. 1983), *cert. denied*, 464 U.S. 1069, 104 S.Ct. 973, 79 L.Ed.2d 211 (1984). In *Gullett*, we rejected the defendant's contention that this instruction authorized a conviction based on negligent behavior. *Id.* Just as the language in *Gullett* did not permit a conviction based on negligence, neither does the language here -- deliberately failing to inquire despite a strong suspicion and shutting his eyes for fear of what he would learn. *See United States v. Thomas*, 484 F.2d 909, 912-13 (6th Cir.) (where the defendant was charged with knowingly making false statements in purchasing a handgun, we upheld an instruction that to find the defendant knowingly made a false statement, the jury need not find that the defendant actually read the form or had it read to him "if the jury finds from the evidence beyond a reasonable doubt that the Defendant acted with reckless disregard of whether the statements made were true or with a conscious purpose to avoid learning the truth."), *cert. denied*, 414 U.S. 912, 94 S.Ct. 253, 38 L.Ed.2d 151 (1973).

Reviewing as a whole the jury instructions provided in the Joint Appendix, we find that Prince has failed to establish that the jury instructions, as a whole, were confusing, misleading, or prejudicial.

## D.   Denial of Motion for a Continuance

Defendant White was originally indicted on October 20, 1997. On April 3, 1998, the government filed a motion under Federal Rule of Evidence 404(b) to admit certain evidence pertaining to Clarence Crawley. That motion contained the

Now I want to read to you count 17 and then summarize the remaining counts. Count 17 says that on or about March 10, 1995, in the Western District of Tennessee, the defendants Tony White and John Richard Prince, being aided and abetted, counseled and induced by the other, did knowingly and willfully conduct and attempt to conduct a financial transaction which involved the proceeds of a specified unlawful activity – to wit, wire fraud – in violation of Title 18, United States Code, Section 1343, said activity being punishable under the laws of the United States, knowing that the transaction was designed to conceal and disguise the nature, location, source, ownership and control of a specified unlawful activity and that while conducting and attempting to conduct such financial transactions knew the property involved in the financial transaction – to wit, a $13,750 cash transfer – represented the proceeds of some form of unlawful activity, all in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i) and Section 2.

Now, counts 18 through 85, with the exception of 33, which has been dismissed, all allege – reallege and readopt all the facts alleged in count 17 of the indictment except that the date is different and the amount of the wire is different.

That code section provides, in relevant part: Whoever, knowing that property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which, in fact, involves the proceeds of a specified unlawful activity, knowing that the transaction is designed, in whole or part, to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of a specified unlawful activity, shall be guilty of a crime.

In order to prove the crime of money laundering alleged in counts 17 through 85, except 33, the government must establish beyond a reasonable doubt each of the following elements:

*        *        *

And, third, that the defendant knew that the transaction was designed, in whole or in part, either to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of the specified unlawful activity or to avoid a transaction reporting requirement under state or federal law.

\* \* \*

The third element of the offense which the government must prove beyond a reasonable doubt is that the defendant acted with knowledge that the transaction was designed to conceal or disguise the nature, location, source, ownership or the control of the proceeds of a specified unlawful activity – wire fraud – or to avoid a transaction reporting requirement.

The term "transaction" includes a purchase, sale, loan, pledge, a gift, transfer, delivery or other disposition and, with respect to a financial institution, includes a deposit, withdrawal, transfer between accounts, exchange of currency, loan, extension of credit, purchase or sale of any stock, bond, certificate of deposit or other monetary instrument, use of a safe depository, or any other payment, transfer or delivery by, through or to a financial institution by whatever means effected.

If you find that the evidence established beyond a reasonable doubt that the defendant knew of the purpose of a particular transaction in issue and that he knew that the transaction was either designed to conceal or disguise the true origin of the property in question or to avoid a requirement of reporting the transaction, then this element is satisfied. However, if you find that the defendant knew of the transaction but did not know that it was either designed to conceal or disguise the true origin of the property in question or to avoid a requirement of reporting the transaction but, instead, thought that the transaction was intended to further an innocent transaction, you must find that this element has not been satisfied and find the defendant not guilty of this crime.

(Joint Appendix at 1011-1016).

single provision of the instructions can be reviewed in isolation; we must consider the charge as a whole. *United States v. Lee*, 991 F.2d 343, 350 (6th Cir. 1993) (quoting *United States v. Horton*, 847 F.2d 313, 322 (6th Cir. 1988)).

Defendant finds fault in the fact that the jury was not instructed that it had to find "'beyond a reasonable doubt that the defendant was aware of a high probability' of criminal activity." We found no error in the instruction that "'a defendant's knowledge of a fact may be inferred from willful blindness to the existence of the fact. A showing of negligence or mistake is not sufficient to support a finding of willfulness or knowledge.'" *United States v. Hoffman*, 918 F.2d 44, 46-47 (6th Cir. 1990) (per curiam). In *Hoffman*, we held that because the instructions as a whole required the jury to find that the defendant had committed all the elements of the crime beyond a reasonable doubt, any error in an individual instruction was harmless. *Id.* at 47. In the present case, the court instructed the jury on numerous occasions that the burden of proof was beyond a reasonable doubt and that the government must satisfy that burden on each element of the crimes charged. When instructing the jury on the second element of money laundering, the court stated that the government must prove that element beyond a reasonable doubt.

We also have upheld deliberate ignorance instructions which did not contain the "high probability" language. *See United States v. Holloway*, 731 F.2d 378, 380-81 (6th Cir. 1984) (upholding the instruction that a knowledge of falsehood element in 18 U.S.C. section 287[14] may be inferred from "'proof that the defendant deliberately closed his eyes or her eyes to what would otherwise have been obvious to him or her.'"). This instruction in *Holloway* is comparable to the instruction in the present case permitting an inference from

---

[14] 18 U.S.C. section 287 prohibits making and presenting fraudulent tax refund checks to the Department of the Treasury.

Prince contends that the deliberate ignorance instruction was contrary to the pattern instruction[13] and an erroneous statement of law.  According to Prince, the instruction permitted the jury to convict him on a negligence standard.

This court reviews jury instructions as a whole to determine whether they fairly and adequately inform the jury of relevant considerations and explain the applicable law to assist the jury in reaching its decision.  *United States v. Layne*, 192 F.3d 556, 574 (6th Cir. 1999) (citations omitted); *United States v. Harrod*, 168 F.3d 887, 890 (6th Cir. 1999) (citations omitted).  Trial courts have broad discretion in drafting jury instructions, and we reverse only for abuse of discretion.  *United States v. Moore*, 129 F.3d 873, 876-77 (6th Cir. 1997) (citing *United States v. Busacca*, 863 F.2d 433, 435 (6th Cir. 1988)).  We will not reverse the trial court unless the jury charge "'fails accurately to reflect the law.'"  *Layne*, 192 F.3d at 574 (quoting *United States v. Busacca*, 863 F.2d 433, 435 (6th Cir. 1988)).  We may reverse a judgment based on an improper jury instruction "'only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial.'"  *Harrod*, 168 F.3d at 892 (quoting *Beard v. Norwegian Caribbean Lines*, 900 F.2d 71, 72-73 (6th Cir. 1990)).  No

---

[13]Sixth Circuit Pattern Jury Instruction 2.09 provides as follows:

(2) No one can avoid responsibility for a crime by deliberately ignoring the obvious.  If you are convinced that the defendant deliberately ignored a high probability that ____, then you may find that he knew ____.
(3) But to find this, you must be convinced beyond a reasonable doubt that the defendant was aware of a high probability that ____, and that the defendant deliberately closed his eyes to what was obvious. Carelessness, or negligence, or foolishness on his part is not the same as knowledge, and is not enough to convict. This, of course, is all for you to decide.

*United States v. Lee*, 991 F.2d 343, 350 n. 2 (6th Cir. 1993) (citing Pattern Criminal Jury Instructions, U.S. Sixth Circuit District Judges Ass'n, (West 1991)).  We have upheld an instruction derived from this pattern instruction. *See United States v. Mari*, 47 F.3d 782, 785 (6th Cir. 1995) (citations omitted).

Defendant Prince argues that while the indictment charged him under 18 U.S.C. section 1956(a)(1)(B)(i), the government presented evidence to support a conviction under section 1956 (a)(1)(B)(i) or (ii) and the court instructed the jury that they could convict Defendant Prince under either section 1956 (a)(1)(B)(i) or (ii).  Defendant Prince refers to the above-quoted jury instructions and to testimony regarding the structuring of transactions that were greater than $10,000. The testimony of Chris Mathis provides, in pertinent part, as follows:

Q  Are you aware that $10,700 and these other amounts in excess of $10,000 required a CTR to be – a cash transaction report to be reported to the IRS?
A  No, sir.
Q  You were not aware of that?
A  If I received the money I was supposed to report it?
Q  No; that the bank would report it.
A  I'm assuming they would; yes.
Q  Okay.  You knew that that report would be made.
A  Yes.
Q  Now, on the same exhibit there are two checks made out on the same date, one for $700 and one for $10,000.
A  Yes.
Q  Why are there two checks instead of just one?
A  I don't remember.  I'm assuming that one came in and wasn't correct and I went back and got – and got the – what money I was supposed to get.
Q  Um-hum.  Now, that would be the first wire transfer reflected on the other page; is that correct?  February the 13th?
A  Yes; ten thousand seven hundred.

 *    *    *

Q  Mr. Mathis, some of these transactions occurred within – either on the same day or within very short days, and they're almost $10,000.  Did that not send any flags up to you that something wasn't quite kosher?

A   No.  Initially, the first couple of times I didn't think anything about it.   And then the third time, I indicated I didn't want – that it didn't seem correct to me to be doing this, and I asked that it not be done again, and then I was talked into doing it one more time.

\*   \*   \*

Q   Did you tell him it was a violation of law to structure transactions?

A   No, sir.

Q   You know what structuring is, don't you?

A   No.

Q   You don't know that it's illegal to have cash transactions barely less than $10,000 so that it's avoided for reporting?

A   No, sir, I didn't know that.

\*   \*   \*

[on cross-examination by counsel representing Prince]

Q   I believe you said when Mr. Grinalds first asked you about the bank reporting transactions of $10,000 or more, you said you assumed they would be reported; is that right?

A   If they – yeah, if they legally have to.  I didn't know exactly what the breakdown was, but – I don't get involved in that type thing at all.

Q   It didn't concern you that this would be reported?

A   No, it did not.  Didn't think about it.  I wish I had of, by the way.

(Joint Appendix at 707-08, 712-13, 721).

Although Defendant Prince does not refer to her testimony in his appellate brief, Mary Lucille Bell's testimony provides, in pertinent part, as follows:

\*   \*   \*

Q   And the check amount – check number is 1549; is that correct?

A   Right.

(Joint Appendix at 1014).[12]

---

[12]In his appellate brief, Defendant Prince fails to specifically identify the jury instructions to which he objects.  As quoted above, the court instructed the jury on willful blindness when it instructed the jury on the second element of money laundering.  The court also instructed the jury on deliberate ignorance in explaining the second element of wire fraud, *i.e.*, defendant was a knowing participant and acted with a specific intent to defraud.  Those instructions provide as follows:

As a practical matter, then, in order to sustain the charges against the defendants, the government must establish beyond a reasonable doubt that defendant knew that his conduct as a participant in the scheme was calculated to deceive, and, nonetheless, he associated himself with the alleged fraudulent scheme for the purpose of causing some loss to another.

The government can also meet its burden of showing that the defendant had knowledge of the falsity of the statements if it establishes beyond a reasonable doubt that he acted with deliberate disregard of whether the truths -- of whether the statements were true or false or with a conscious purpose to avoid learning the truth.

If the government establishes that the defendant acted with deliberate disregard for the truth, the knowledge requirement would be satisfied unless the defendant actually believed the statements to be true.  This guilty knowledge, however, cannot be established by demonstrating that the defendant was merely negligent or foolish.

To conclude on this element, if you find that the defendant was not a knowing participant in the scheme, or that he lacked the specific intent to defraud, you should acquit him.  On the other hand, if you find that the government has established beyond a reasonable doubt not only the first element – namely, the existence of the scheme to defraud – but also the second element – that the defendant was a knowing participant and acted with specific intent to defraud – and if the government also establishes the third element, which I am about to instruct you, then you have a sufficient basis upon which to convict the defendant.

(Joint Appendix at 1009-10).  Based on Prince's argument, it appears that he contests only the willful blindness instruction provided in the instructions on money laundering which is quoted in the text above.

inconsistencies constituted a variance which did not rise to the level of a constructive amendment.

## C.  Deliberate Ignorance Instruction

Defendant Prince contends that the district court committed reversible error when it instructed the jury on deliberate ignorance. The court instructed the jury on willful blindness while defining the second element of money laundering, *i.e.*, knowledge that the property involved in the financial transaction was the proceeds of some form of unlawful activity. The pertinent instructions provide as follows:

\*    \*    \*

The second element of the offense which the government must prove beyond a reasonable doubt is that the defendant knew that the property involved in the financial transaction was the proceeds of some form of unlawful activity. I instruct you that this element refers to a requirement that the defendant knew the property that was involved in the transaction represented proceeds from some form, though not necessarily which form, of activity that constitutes a felony under state, federal or foreign law. I instruct you as a matter of law that wire fraud is a felony.

You may infer that the defendant had knowledge from circumstantial evidence or from evidence showing willful blindness by the defendant. Willful blindness exists when a defendant, whose suspicion has been aroused, deliberately fails to make further inquiry. If you find that the defendant had a strong suspicion that someone withheld important facts, yet shut his eyes for fear of what he would learn, you may conclude that he acted knowingly.

---

right to the assurance that a group of independent citizens had concluded that the allegations were worthy of being presented to a jury. *Id.*

Q   Check 1548 is for the same amount on the same day?
A   Right.
Q   And there are two checks for $9,500; is that correct?
A   That is right.
Q   Why didn't you write one check for $19,000?
A   Well, I was told at – the bank said if I wrote the checks for less than $10,000 that they would not be reported. And that's what I did: I wrote the checks for less than ten. I also had checking accounts in both of these banks, too.
Q   Okay. Exhibit 20 shows a withdrawal of $18,000, a deposit ticket, and then a withdrawal of – if my math is correct – $18,000.

\*    \*    \*

Q   What are the dates on those checks, please, ma'am?
A   September the 1st, '95.
Q   Again, you wrote two checks instead of one?
A   Right.
Q   On August 9th of '95 how much did you give John?
A   The amount of those two checks.
Q   What's the total amount? Fifteen thousand?
A   Fifteen thousand is correct.
Q   October 24th, two checks. How much were those?
A   Nineteen thousand, it looks like, or twenty.

(Joint Appendix at 449-50).

Defendant Prince failed to object to the evidence and the jury instructions which he alleges amended the indictment. In its appellate brief, the government does not raise the issue of waiver. In *United States v. Beeler*, 587 F.2d 340, 343 (6th Cir. 1978), we held that the defendant did not waive objection to the variance between the indictment and proof at trial by not raising the issue at trial. We later explained this ruling in *United States v. Williams*, 962 F.2d 1218, 1225 (6th Cir. 1992), while addressing whether an objection to an alleged variance between a bill of particulars and proof offered at trial must be made when the evidence is offered. We held that Williams, by failing to object at trial, did not preserve this

issue for appeal. *Id.* Williams cited *Beeler* in support of his contention that it was unnecessary for him to object at trial. *Id.* We responded that the purpose of an objection is to allow the court to correct its mistakes. *Id.* at 1225-26. While the Federal Rules of Criminal Procedure permit the amendment of a bill of particulars at any time that justice requires, indictments "may not be amended because doing so would 'substitute the prosecutor's judgment for that of the constitutional body, the Grand Jury, in framing the charge against a defendant.'" *Id.* at 1226. Therefore, we concluded that an objection to an alleged variance from a bill of particulars "serves a useful function" and must be raised at trial in order to preserve the issue for appeal. *Id.*

In the present case, the alleged mistake was allowing certain testimony and inserting section 1956 (a)(1)(B)(ii) in the jury instructions. Both of these alleged errors could have been corrected. *See United States v. Garguilo*, 554 F.2d 59, 63 (2nd Cir. 1977) (holding that "[b]y failing to object to the introduction of the evidence on capital gains, by conceding that the capital gains could properly be used as proof of items of income in 1969, and by failing to argue to the trial judge that this constituted an impermissible variance of the indictment, appellant waived his right to raise that portion of his variance argument on appeal."). According to the transcripts provided on appeal, Prince failed to object.

Even if, *arguendo*, Prince preserved this issue for appeal, there was no amendment or fatal variance to the indictment. We review *de novo* whether there was an amendment or a variance to the indictment. *United States v. Flowal*, 163 F.3d 956, 962 (6th Cir. 1998).

"'[A]n amendment involves a change, whether literal or in effect, in the terms of the indictment.'" *Id.* (quoting *United States v. Barrow*, 118 F.3d 482, 488 (6th Cir. 1997)). In contrast, "'[a] variance occurs when 'the charging terms [of the indictment] are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment.'" *Id.* If a variance infringes too strongly upon the

assurance that independent citizens have concluded that the allegations are "'worthy of being presented to a jury'" for a determination of guilt or innocence. *See Moore*, 129 F.3d at 878 (citations omitted). There is not a substantial likelihood that the jury convicted Prince of an offense other than that charged in the indictment. *See Flowal*, 163 F.3d at 962; *Manning*, 142 F.3d at 339 ("A variance crosses the constructive amendment line only when the variance creates 'a substantial likelihood' that a defendant may have been convicted of an offense other than that charged by the grand jury") (citing *United States v. Hathaway*, 798 F.2d 902, 911 (6th Cir. 1986)).

None of the purposes behind the constructive amendment rule were frustrated here. *See Moore*, 129 F.3d at 873.[11] Any

---

[11] In *Moore*, 129 F.3d at 874, the defendant contended that the trial court's instructions on three mail fraud counts constructively amended the indictment. The mail fraud counts of the indictment charged that the defendant "'devised and intended to devise a scheme and artifice to defraud and obtain money' by means of fraudulent pretenses, representations, and processes." *Id.* In describing the manner in which the defendant used the Postal Service, the indictment referred to "'the aforesaid scheme and artifice to defraud,' omitting the words 'and to obtain money' that were included in the two earlier and several later descriptions of the scheme." *Id.* In the jury instructions, the court defined the first element of the mail fraud offense as "'the act or acts of having devised or having intended to devise a scheme or artifice to defraud or attempt to defraud or obtain money by false or fraudulent representations as charged in the indictment....'" *Id.* at 874-75. The court further instructed the jury that "'[t]he government need not establish that all the pretenses, that all the representations, statements and acts set forth in the indictment occurred. But must show beyond a reasonable doubt that one or more acts or statements occurred such as will satisfy you of the existence of the scheme to defraud or obtain money.'" *Id.* at 875. We rejected the defendant's argument of constructive amendment reasoning that anyone reading the mail fraud counts would understand the charges alleged, the defendant would know what charges he would face at trial, and the court would understand what was required for a conviction. *Id.* at 878. We also found that the court's instructions did not change the charge or broaden the scope of the indictment, they raised no possibility that the defendant could be prosecuted later for the same offense, and they did not require the defendant to defend against an uncharged scheme. *Id.* We found no infringement of the defendant's

of the proceeds of the wire fraud. Proof that Prince avoided transactions that would require a bank to submit a cash transaction report to the Internal Revenue Service supports the conclusion that Prince was intending to conceal the transactions. In its closing argument, the government stated that the elements of money laundering were that the defendants "committed a transaction in an effort to conceal the proceeds of the criminal activity." At least three times during its closing argument, the government stated that Prince conducted the transactions in an effort to hide and to conceal. The government did not argue that Prince conducted the transactions in an effort to avoid a reporting requirement.

Prince has not provided this Court with transcripts from his counsel's opening or closing arguments, but from his testimony on direct examination it appears that Defendant's theory was that he was an innocent victim.[10] Mr. Mathis and Mrs. Bell's testimonies as to the transactions involving more than $10,000 was, arguably, proof of an intent to conceal. Thus, Prince had an incentive to challenge these testimonies on cross-examination. Likewise, he had an incentive to rebut these testimonies. He testified and thus had the opportunity to rebut these testimonies by stating that he did not instruct Mr. Mathis or Mrs. Bell on how to structure the transactions, that there was an innocuous reason for the structure of those transactions, or that he did not know that a cash transaction report would be generated. We conclude that Prince's defense was unaffected as he had the motive and opportunity to rebut the only evidence presented that could support an argument for an intent to avoid a transaction reporting requirement and he chose not to rebut that evidence.

Prince has not argued nor do we find that the court's instructions raised the possibility that he could be prosecuted later for the same offense. Prince has not argued nor do we find that there has been an infringement on his right to the

---

[10]In his appellate brief, Defendant Prince stated that he "emphatically testified that he did not have knowledge of an illegal scheme to defraud."

defendant's Sixth Amendment right to be informed of the nature and cause of the accusation, the variance is considered a "constructive amendment." *Martin v. Kassulke*, 970 F.2d 1539, 1542 (6th Cir. 1992) (citing *United States v. Ford*, 872 F.2d 1231, 1235 (6th Cir. 1989)). A constructive amendment occurs when "'the terms of the indictment are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of an offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment.'" *United States v. Manning*, 142 F.3d 336, 339 (6th Cir. 1998) (quoting *United States v. Hathaway*, 798 F.2d 902, 910 (6th Cir. 1986)). Both amendments and constructive amendments are considered *per se* prejudicial and warrant reversal. *United States v. Ford*, 872 F.2d 1231, 1235 (6th Cir. 1989) (citations omitted); *United States v. Beeler*, 587 F.2d 340, 342 (6th Cir. 1978) (citing *United States v. Somers*, 496 F.2d 723, 744 (3rd Cir. 1974)). The harmless error test generally applies to variances. *Martin*, 970 F.2d at 1542; *Beeler*, 587 F.2d at 342 (citations omitted).

In this case, there was no actual amendment as Defendant Prince was indicted on and convicted of money laundering. *See Martin*, 970 F.2d at 1542 ("This case does not present us with an actual amendment; Martin was charged with aiding a rape, and Jameson was clearly convicted for committing a rape."). Thus, we must determine whether the variance rises to the level of a constructive amendment.

To obtain reversal of a conviction because of a variance between the indictment and the evidence produced at trial, a defendant must satisfy a two-prong test: (1) the variance must be demonstrated and (2) the variance must affect some substantial right of the defendant. *United States v. Maliszewski*, 161 F.3d 992, 1014 (6th Cir. 1998) (quoting *Manning*, 142 F.3d at 339 (citations omitted)). A substantial right is affected only when the defendant establishes prejudice in his ability to defend himself or to the overall fairness of the trial. *Manning*, 142 F.3d at 339 (citing *United States v. Bouquett*, 820 F.2d 165, 168 (6th Cir. 1987)).

The purposes underlying the rule against amendments and constructive amendments include notice to the defendant of the charges he will face at trial, notice to the court so that it may determine if the alleged facts are sufficient in law to support a conviction, prevention of further prosecution for the same offense, and finally, of 'paramount importance,' the assurance that a group of citizens independent of prosecutors or law enforcement officials have reviewed the allegations and determined that the case is worthy of being presented to a jury for a determination of the defendant's guilt or innocence.

*United States v. Moore*, 129 F.3d 873, 878 (6th Cir. 1997) (citations omitted).

Prince has illustrated a variance between the indictment and the jury instructions. It is not so clear whether he has illustrated a variance between the indictment and the evidence presented at trial. Arguably, the evidence to which Prince now objects was evidence establishing that the transactions were designed to conceal – an element of the money laundering offense charged in the indictment. However, since we acknowledge a variance between the indictment and the jury instructions, we will proceed to the second prong of the test, *i.e.*, whether the variance affected some substantial right of the defendant.

In *Martin*, 970 F.2d 1539, one of the defendants, Martin, who was convicted of aiding and abetting first-degree rape, sought habeas corpus relief contending that the variance between the indictment and the jury instructions constituted a constructive amendment. The indictment charged Martin with the offense of "RAPE IN THE FIRST DEGREE by knowingly and unlawfully engaging in sexual intercourse with Nancy Bellamy by forcible compulsion and further causing said Nancy Bellamy serious physical injury." *Id.* at 1542. The jury instruction by which Martin was found an accessory to the rape listed the elements of rape as engaging in sexual intercourse and doing so by forcible compulsion *or* doing so while the victim was incapable of consent because she was

physically helpless. *Id.* We defined the "key question" in determining whether the case involved a variance or a constructive amendment as whether rape by forcible compulsion and rape due to physical helplessness should be seen as two alternative crimes or merely two alternative methods by which the one crime, rape, could have been committed. *Id.* at 1543. If they should be seen as two alternative methods, then the addition of the physically helpless charge would be a variance. *Id.* We rejected Martin's argument that the due process right to clear notice of criminal charges includes notice of the exact method by which the criminal actions were alleged to have been committed. *Id.* We held that the rape elements constituted alternative methods and thus the addition was a variance. *Id.* at 1545. Finding that the evidence supported the forcible compulsion theory and that the presented defense of consent represented a full defense to both methods, we held that no prejudicial error occurred. *Id.* at 1546-47.

In the present case, Defendant Prince has failed to establish a violation of a substantial right, and thus he has failed to establish that the variance between the indictment and the jury instructions along with the evidence at trial constituted a constructive amendment. The indictment provided notice to Prince and the trial court of the money laundering charges Prince faced at trial. As in *Martin*, the added instruction provided an alternative method to one offense, here, money laundering. Prince was not prejudiced even by this alternative method, as it appears that the government did not pursue this theory either during the evidence or argument phases of the trial. Nowhere in the portions of the transcript provided to this Court does the government argue to the jury that it would establish or has established that Prince engaged in money laundering to avoid a transaction reporting requirement. In the transcript of the government's cross-examination of Prince, there are no questions designed to elicit testimony regarding his knowledge of or intent to avoid a reporting requirement. Arguably the above testimony of Mr. Mathis and Mrs. Bell was elicited to support the allegation that Prince engaged in money laundering in order to conceal the location