RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 07a0250p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

No. 05-6742

GERALD RAYBORN,

*Defendant-Appellant.*

> Appeal from the United States District Court
> for the Western District of Tennessee at Memphis.
> No. 04-20177—J. Daniel Breen, District Judge.

Argued: April 17, 2007

Decided and Filed: July 2, 2007

Before: MARTIN and DAUGHTREY, Circuit Judges; SCHWARZER, District Judge.[*]

_____

## COUNSEL

**ARGUED:** K. Jayaraman, Memphis, Tennessee, for Appellant. Kevin P. Whitmore, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellee. **ON BRIEF:** K. Jayaraman, Memphis, Tennessee, for Appellant. Kevin P. Whitmore, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellee.

_____

## OPINION

_____

BOYCE F. MARTIN, JR., Circuit Judge. Defendant Gerald Rayborn was charged with one count of conspiracy to commit mail fraud, wire fraud, and money laundering in violation of 18 U.S.C. § 371, two counts of aiding and abetting mail fraud in violation of 18 U.S.C. §§ 1341 and 2, and money laundering in violation of 18 U.S.C. § 1957. Following a jury trial, he was convicted on all counts, and now brings this appeal. For the reasons below, we **AFFIRM** Rayborn's conviction.

---

[*] The Honorable William W Schwarzer, United States District Judge for the Northern District of California, sitting by designation.

# I. BACKGROUND

Gerald Rayborn was a pastor at the Mt. Sinai Missionary Baptist Church in Memphis, Tennessee. He had hired Larry Bullock, a Certified Public Accountant (CPA), to be his personal accountant as well as the church's accountant. In 1999, Bullock began preparing tax returns for Rayborn and his wife, Bonnie Rayborn. The Rayborns claimed at trial that they had never prepared their tax returns and they did not understand how to prepare them. Further, according to Ms. Rayborn's trial testimony, neither she nor her husband read their tax forms before signing them.

In 2002, after living at 102 Armstrong in the Whitehaven area of Shelby County for thirty years, Gerald and Bonnie Rayborn entered the housing market to find a new home. Apparently, they had originally decided to remodel their old home, but while they were in Bullock's office working on their taxes, Bullock suggested that they instead purchase a new home. Bullock introduced the Rayborns to Marion Brown, a mortgage broker who was coincidentally in Bullock's office at the time. Brown referred real estate agent Vinnie Flynn to them. The Rayborns told Flynn that they desired a home that had several bedrooms and a fishing pond, and were looking to spend about $475,000. Flynn eventually located a home that the Rayborns liked, and the parties negotiated a sale price of $525,000. The closing date was set for April 29, 2002.

Rayborn, with the assistance of Brown, applied for a mortgage loan through Wells Fargo Mortgage. A document verifying Rayborn's income and employment and signed by Bullock was included in the loan package. Wells Fargo also required Rayborn to include copies of his 2000 and 2001 federal tax returns so it could calculate Rayborn's average monthly income, which, in turn, would determine his loan eligibility. All loan materials received by Wells Fargo were sent via Federal Express. The Rayborns' 2000 and 2001 tax returns listed their adjusted gross income (AGI) as $84,274 and $103,206, respectively. Wells Fargo calculated an average monthly income of $6,788. After Rayborn agreed to pay off some personal consumer loans, Wells Fargo approved the mortgage loan. The home purchase was completed on May 20, 2002. On that date, Rayborn signed a promissory note for $498,750.00, which required monthly payments of $3,318.20. Also on May 20, 2002, Wells Fargo wired most of that amount on Rayborn's behalf to the closing agent. Rayborn was required to re-sign the documents that were part of his original loan package.

Four months later, on August 29, 2002, the Rayborns, through their mortgage broker, applied to Wells Fargo for a refinancing loan. Rayborn re-submitted copies of the 2000 and 2001 tax returns used to obtain the original loan. Wells Fargo originally denied the loan due to Rayborn's excessive obligations and insufficient income. In response, Rayborn submitted a lease to Wells Fargo that indicated he was leasing his former residence to one "Stacey Johnson" for $1,300 a month. The lease appears to be signed by Gerald Rayborn and Johnson, who is in fact Rayborn's daughter. Wells Fargo was unaware of the relationship between Rayborn and Johnson. With this increase in income, along with Rayborn's agreement to pay off several credit cards, Wells Fargo approved the refinancing loan. On October 7, 2002, Rayborn signed another promissory agreement, this time for $486,000.00. This promissory note also contains Bonnie Rayborn's signature. Wells Fargo wired $483,171.08 to the closing agent. These funds were used to pay off the original mortgage with Wells Fargo.

Although Wells Fargo believed that the 2000 and 2001 tax returns it received were the same tax returns that the Rayborns had submitted to the IRS, they were not. The tax returns that were submitted to the IRS provided that in 2000 and 2001, the Rayborns actually had an AGI of $7,462 and $20,634, respectively. Such income would make a the financing of a $525,000 home far beyond their means.

With respect to the lease submitted to Wells Fargo, Stacy Johnson testified at Rayborn's trial that she never paid $1,300 a month to her father, and had never signed, nor even seen, the lease. The

lease document itself contained some suspicious inconsistencies. While Johnson's first name is spelled S-T-A-C-Y, the signature on the lease reads S-T-A-C-E-Y. In addition, at the top of the lease it correctly states the home address to be "102 Armstrong," but farther down it misstates the address as "108 Armstrong."

Charlotte Ware, a forensic document examiner for the United States Postal Inspection Service, examined the signatures on the tax returns filed with the IRS and Wells Fargo. According to Ware's testimony at Rayborn's trial, she concluded that Rayborn signed his name on the 2001 return filed with the IRS and the 2001 return submitted to Wells Fargo, and that Rayborn probably signed his name on the 2000 Wells Fargo return. In addition, she testified that Bullock probably signed Bonnie Rayborn's name to the 2001 IRS tax return. Bonnie Rayborn testified that she did not sign her name to the 2001 IRS return or the 2000 Wells Fargo return (her signature was not on the 2000 Wells Fargo return). Ms. Rayborn also identified Gerald Rayborn's signature on the 2000 Wells Fargo return, and testified that the IRS returns, but not the Wells Fargo returns, were consistent with her husband's income during that time period. She testified that she was unaware of the Wells Fargo returns, and had never authorized Bullock, or anyone else, to send tax returns to Wells Fargo on her behalf.

On April 7, 2004, a federal grand jury returned an indictment against Gerald Rayborn, charging him with one count of conspiracy to commit mail fraud, wire fraud, and money laundering in violation of 18 U.S.C. § 371, two counts of aiding and abetting mail fraud in violation of 18 U.S.C. §§ 1341 and 2, and money laundering in violation of 18 U.S.C. § 1957. On July 18, 2005, the jury convicted Rayborn of all four counts. He was sentenced to nine months' imprisonment followed by three years' supervised release. He now appeals his conviction.[1]

## II. ANALYSIS

### A. Sufficiency of the Evidence for Conviction Under 18 U.S.C. § 1957

After the defense rested, it renewed its motion for acquittal as a matter of law. The court denied this motion for the first three counts, but deferred its ruling on the fourth count (money laundering). The district court ultimately decided, after looking over the indictment, that there was enough evidence to send all four counts to the jury. On appeal, Rayborn contends the evidence presented at his trial was insufficient to sustain his conviction for money laundering.[2]

There are five required elements that the jury had to find in order to convict Rayborn of violating 18 U.S.C. § 1957: (1) Rayborn was engaged in a monetary transaction; (2) Rayborn knew that the transaction involved criminally derived property; (3) the property was greater than $10,000; (4) the property was derived from a violation of 18 U.S.C. § 1341 (mail fraud); and (5) the transaction occurred in the United States. The only issue raised on appeal is whether the second element — that the transaction involved "criminally derived property" — is satisfied. Section 1957 provides that "the term 'criminally derived property' means any property constituting, or derived from, proceeds obtained from a criminal offense." 18 U.S.C. § 1957(f)(2). This means that "the

---

[1]Larry Bullock was indicted along with Rayborn and tried separately. Bullock was charged with one count of conspiracy to commit mail fraud, wire fraud, and money laundering in violation of 18 U.S.C. § 371, and two counts of aiding and abetting mail fraud in violation of 18 U.S.C. §§ 1341 and 2. On June 9, 2005, the jury convicted Bullock of all three counts. He was sentenced to three months' imprisonment, three months' home confinement, and three years' supervised release. Bonnie Rayborn was also charged with her husband and Bullock, but later dismissed from the indictment.

[2]The money laundering count against Rayborn pertained to the original loan, issued on May 20, 2002.

funds must represent proceeds from some form of activity that constitutes a felony." *United States v. Prince*, 214 F.3d 740, 747 (6th Cir. 2000).

In *Prince*, the underlying felony from which the proceeds were derived was wire fraud. *Id*. In order to sustain conviction, the government had to prove that the proceeds of the wire fraud were then used to commit the money laundering offense. *Id*. at 748. *See United States v. Butler*, 211 F.3d 826, 829 (4th Cir. 2000) ("Congress did not fashion the money laundering statute to create a new source of criminal liability for every fraudulent monetary transaction. Rather, both the plain language of § 1957 and the legislative history behind it suggest that Congress targeted only those transactions occurring *after* proceeds have been obtained from the underlying unlawful activity." (emphasis added and internal quotation marks and citations omitted)). Additionally, the government did not need to prove that Prince had physical possession of the property in order to prove that the money constituted "proceeds." *Prince*, 214 F.3d at 748.

The government's theory of the case is that Rayborn committed his underlying felony, mail fraud, by sending fraudulent documents to Wells Fargo in order to procure a loan. As a result of that criminal offense he received proceeds—the $498,750 loan. Then, subsequent to obtaining these criminally derived proceeds, the money was transferred by Wells Fargo to the closing agent in order to facilitate the purchase of the home. This constituted "laundering" through the commission of a monetary transaction with the ill-begotten funds. *See Butler*, 211 F.3d at 829.

Rayborn argues that his conviction cannot stand because he never obtained these funds or exercised control over them until after Wells Fargo transferred the funds (the alleged monetary transaction). According to his brief, "[u]nder no possible reading of *Prince*, or any logical reasoning whatever, could the defendant be said to have been in control of the funds prior to the time Wells Fargo wired them to the closing attorney." Appellant's Br. at 32. We disagree. The first step in the scheme was the commission of the underlying offense of mail fraud, which occurred when Rayborn sent fraudulent tax documents and other loan application materials to Wells Fargo. After receiving these documents, Wells Fargo approved a loan in the amount of $498,750, which constituted the proceeds of the predicate offense. At that moment, those proceeds belonged to Rayborn; the fact that proceeds were never in Rayborn's physical possession, or even in a personal bank account, is of no moment. *Prince*, 214 F.3d at 748. After all, Rayborn signed documents directing Wells Fargo to transfer the funds to the closing agent. Thus, he exercised control over the proceeds of the mail fraud. *See United States v. Savage*, 67 F.3d 1435, 1443 (9th Cir. 1995) (finding that for purposes of § 1957, where proceeds derived from mail fraud were deposited into accounts, it was irrelevant that these accounts were not in defendant's name, since defendant exercised control over the accounts). This subsequent transaction, which ultimately resulted in the acquisition of title to the home, constituted the "laundering" of the proceeds of the mail fraud. For these reasons, there was sufficient evidence to sustain Rayborn's money laundering conviction.

### B. Bullock's Alleged Statement to Ms. Rayborn

According to Ms. Rayborn, when the Rayborns and Bullock were at the federal building to be processed after the indictment was issued, Bullock was pacing back and forth and said to her, "Ms. Rayborn, I'm sorry I got y'all down here." Outside the presence of the jury, defense counsel questioned her about this hearsay statement and moved to have it admitted under Fed. R. Evid. 804(b)(3) as a statement against penal interest by an unavailable witness. The government objected. Rayborn argues that Bullock was "basically [ ] saying he's sorry he got them down here, that it's his fault and goes to that point." Appellant's Br. at 16. The district court held that the statement was inadmissible. This ruling is reviewed for abuse of discretion. *United States v. Hilliard*, 11 F.3d 618, 619 (6th Cir. 1993).

Even if we were to hold that the district court abused its discretion by refusing to admit the statement, we are convinced that such error would be harmless. "The harmless error standard calls for reversal when the appellate court lacks a fair assurance that the outcome of a trial was not affected by evidentiary error. We shall, therefore, reverse the lower court only if we are firmly convinced that a mistake has been made." *McCombs v. Meijer, Inc.*, 395 F.3d 346, 358 (6th Cir. 2005) (citations and quotation marks omitted).

First, there was substantial evidence presented at trial—in testimonial and documentary form—establishing Rayborn's guilt. And while it is true that the nature of Rayborn's defense was that he was ignorant and misinformed by his accountant, he had ample opportunity to present evidence in support of this defense. This evidence included testimony by Ms. Rayborn, and as the guilty verdict demonstrates, the jury did not find her testimony credible. Thus, it is quite likely that the jury would not have believed her in this instance either. Furthermore, the jury could have found that *she* had been kept in the dark, but that Rayborn himself had not been so misinformed. Such a finding would be supported by testimony that Rayborn had signed fraudulent documents, and evidence indicating that he was more deeply involved with the family finances than Ms. Rayborn (for example, the fact he paid off personal debts in order to secure both loans). Finally, Bullock's alleged statement is quite vague, and is by no means a slam dunk admission of guilt. The jury could have found that it was not necessarily any more exculpatory than the other evidence that Rayborn presented at trial. Based on our review of the trial record, we cannot say that we are "firmly convinced that a mistake has been made." *Id*. at 358. Therefore, any error was harmless and does not warrant a new trial.

## C. Jury Instruction Regarding Rayborn's Knowledge of the Contents of the Tax Returns

The government requested that the district court give the following instruction to the jury:

> If you find beyond a reasonable doubt that the defendant signed the tax return, that is evidence from which you may but are not required to find or infer that the defendant had knowledge of the contents of the return.

The government argued that this instruction was derived from Internal Revenue Code § 6064. However, as defense counsel pointed out to the district court, this section actually states: "The fact that an individual's name is signed to a return, statement, or other document shall be prima facie evidence for all purposes that the return, statement, or other document *was actually signed by him*." 26 U.S.C. § 6064 (emphasis added). The statute does not refer to the signer's *knowledge* of the contents of the return. The district court agreed with defense counsel that the language of the statute is different than the language of the government's proposed instruction. Nevertheless, it ruled that it would give the instruction, explaining that "because what they say is it provides simply a permissible inference and that it doesn't draw away, it doesn't defeat in this case the defendant's position that he relied on a tax professional's advice as a defense, which in some respects I think is what Mr. Rayborn is arguing in this case." Rayborn argues that although he never disputed signing the forms, he based his defense on the theory that he did not know the contents of the forms, and this instruction impermissibly allowed the jury to infer his knowledge, "which would be both practically dispositive of the issue of guilt and directly contrary to the good-faith defense." Appellant's Br. at 43. We review the jury instructions given by a district court for abuse of discretion. *Prince*, 214 F.3d at 761.

In a similar case, our sister circuit held the district court erred in instructing the jury that a tax return signed by the defendant created a rebuttable presumption that the defendant signed the return and had knowledge of its contents. *United States v. Trevino*, 419 F.3d 896, 902 (9th Cir. 2005). The Ninth Circuit found that § 6064, upon which this instruction was based, did not support this presumption. *Id*. But even if we were to hold that the district court erred by adopting the

government's proposed instruction, which in no way reflected the actual language of § 6064, this error does not require a new trial.  The instruction in *Trevino*, which the Ninth Circuit found was a harmless error, was far more damning, as it told that jury that the defendant's signature created a rebuttable presumption of her knowledge.  Here, on the other hand, the jury was simply informed if they found beyond a reasonable doubt that Rayborn had signed the returns, it *may* make such a finding or inference.  Further, we have little doubt that even without the instruction, the jury would have, on its own, made the logical leap that Rayborn's signature indicated that he may have had knowledge of the contents.  *See United States v. Wainwright*, 413 F.2d 796, 802 (10th Cir. 1969).  In fact, this instruction may have been helpful to Rayborn, as it informed the jury that they were "*not required* to find or infer that [Rayborn] had knowledge of the contents of the return."  (Emphasis added.)  Therefore, we find that this error was harmless.

### D.  Jury Instruction Regarding Deliberate Ignorance

Defense counsel also objected to the proposed jury instruction on deliberate ignorance,[3] arguing that the issue before the jury was whether Rayborn knew that the returns he signed were not the ones submitted to the IRS, and that there was no evidence that Rayborn deliberately avoided obtaining knowledge of the returns' contents.  The district court overruled this objection, noting that "I think there certainly is at least inferentially, if not directly, . . . some indication here that Mr. Rayborn could have or may have ignored some probability, high probability that the, because again, as [defense counsel] indicated, I don't think there has been any dispute here that the defendant signed both sets of tax returns."  In his brief, Rayborn argues that the deliberate ignorance theory "has no place in a case of this nature," because the crimes he allegedly committed were specific intent crimes.  Rayborn contends:

> [i]f, in fact, the defendant was a coconspirator with Bullock, who prepared the returns, then the defendant necessarily had to sign the returns with actual knowledge of their fraudulent content.  On the other hand, if the defendant relied in good faith on Bullock to prepare the loan documents properly, then he must have had no knowledge that the contents were fraudulent.

Appellant's Br. at 46.

In support of his argument, Rayborn cites *United States v. Mendoza-Medina*, where the Fifth Circuit held that the district court's giving of an deliberate ignorance instruction was in error because the evidence indicated that the defendant either knew about or did not know about the drugs in his vehicle, foreclosing the possibility of deliberate ignorance.  346 F.3d 121, 134 (5th Cir. 2003).  However, *Mendoza-Medina* also explained that "in some cases evidence of actual knowledge can be interpreted as evidence of a subjective awareness of a high probability of the existence of illegal conduct."  *Id.* (citing *United States v. Lara-Velasquez*, 919 F.2d 946, 952 (5th Cir. 1990)).  Given the facts presented at Rayborn's trial, even under *Mendoza-Medina*, a deliberate ignorance instruction may have been proper here.  Therefore, we are inclined to agree with the district court that the evidence presented in this case supported a deliberate ignorance instruction.

---

[3]This instruction, which was modeled after Section 2.09 of the Sixth Circuit Pattern Instructions, provided, in pertinent part:

> But to find this, you must be convinced beyond a reasonable doubt that the defendant was aware of a high probability that the tax returns he signed for the years 2000 and 2001, which were submitted to support his application for a mortgage and the application to refinance the loan, were false, and that the defendant deliberately closed his eyes to what was obvious.  Carelessness or negligence or foolishness on his part is not the same as knowledge and is not — this, of course, is all for you to decide.

Even assuming *arguendo* that the instruction was given in error, "a legally-erroneous jury charge will not justify reversal of a conviction if its probable effect on the verdict was inconsequential." *United States v. Carney*, 387 F.3d 436, 449 (6th Cir. 2004). This Court has explained that even when it is unsupported by evidence, a deliberate ignorance instruction that properly states the law is harmless error. *United States v. Mari*, 47 F.3d 782, 786 (6th Cir. 1995) (citing *Griffin v. United States*, 502 U.S. 46, 55-56 (1991)). This Court will not overturn a jury's verdict so long as sufficient evidence supports one of the grounds for conviction. *Id.* Here, any error was undoubtedly harmless. First, Rayborn has not argued that the instruction misstated the law on deliberate ignorance. Further, Rayborn does not claim that the district court failed to properly instruct the jury that they must find beyond a reasonable doubt that Rayborn committed all elements of the crimes alleged. *See United States v. Hoffman*, 913 F.2d 44, 46-47 (6th Cir. 1990). Because the jury was properly instructed on the elements for these specific intent crimes, and if, as Rayborn contends, the evidence could have *only* supported a finding that he either knew about or did not know about the falsity of the contents of the forms, the jury must have concluded that Rayborn had actual knowledge of the forms' contents. *See Mari*, 47 F.3d at 785. "To conclude otherwise, i.e., that the jury actually convicted on the basis of deliberate ignorance even though insufficient evidence supported that theory, we would have to assume that the jury ignored the jury instructions." *Id.* In addition, the instructions cautioned the jury that evidence of negligence or foolishness was insufficient. *See id.* (explaining that Section 2.09 of the Sixth Circuit Pattern Instructions forecloses the possibility of causing the jury to convict on the basis of negligence). Finally, the government presented substantial evidence indicating that Rayborn had actual knowledge of the inaccurate information submitted to Wells Fargo. *See Mendoza-Medina*, 346 F.3d at 134-35 ("[A]n error in giving the deliberate ignorance instruction is harmless where there is substantial evidence of actual knowledge." (citations and quotation marks omitted)). Thus, any error in giving a deliberate ignorance instruction was entirely harmless.

### E.  District Court's Failure to Give a "Good-Faith Defense" Instruction

Finally, Rayborn argues that the district court erred by refusing to instruct the jury on the good-faith defense to fraud, found in Section 10.04 of the Sixth Circuit Pattern Instructions. Rayborn's defense was that he relied in good faith on Bullock, his accountant, to properly prepare the loan documents. He contends that he never realized the 2000 and 2001 tax returns prepared for Wells Fargo were incorrect, and that he never engaged in fraudulent conduct. "[W]e have held that it is error to fail to instruct on the defendant's theory of the case." *United States v. McGuire*, 744 F.2d 1197, 1201 (6th Cir. 1984). Rayborn argues that given the "numerous examples of evidence" of his good-faith reliance on Bullock, his right to a fair trial was severely prejudiced.

Unfortunately for Rayborn, however, he failed to ask for a good-faith instruction at trial. As such, we will only review his claim for plain error. *Wood*, 364 F.3d at 708. "An error is plain when it is obvious, affects substantial rights, and seriously affects the fairness or integrity of judicial proceedings." *United States v. Lopez-Medina*, 461 F.3d 724, 739 (6th Cir. 2006). "Moreover, an improper jury instruction will rarely justify reversal of a criminal conviction when no objection has been made at trial, . . . and an omitted or incomplete instruction is even less likely to justify reversal, since such an instruction is not as prejudicial as a misstatement of the law." *United States v. Hook*, 781 F.2d 1166, 1172-73 (citing *Henderson v. Kibbe*, 431 U.S. 145, 154-55 (1977)).

Here, the district court did not commit plain error. First, the prosecution presented a great deal of evidence against Rayborn, including the fraudulent tax returns and expert testimony concluding that Rayborn signed them, a lease containing Rayborn's signature and a forged signature of his daughter, and the simple fact that Rayborn procured a mortgage loan well beyond his means. Second, Rayborn had the opportunity to present evidence that he relied entirely on Bullock. The failure to instruct the jury on the good-faith defense did not affect Rayborn's substantial rights, or

the fairness of the trial. *Lopez-Medina*, 461 F.3d at 739. Accordingly, there was no plain error that justifies a new trial.

For the reasons above, Rayborn's conviction is **AFFIRMED**.