NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0176n.06

No. 10-4326

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Feb 13, 2012**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff-Appellee, | ) | UNITED STATES DISTRICT |
| | ) | C O U R T   F O R   T H E |
| v. | ) | SOUTHERN DISTRICT OF |
| | ) | OHIO |
| MAURICE L. WILLIAMS, | ) | |
| | ) | |
| Defendant-Appellant. | ) | O P I N I O N |

BEFORE:     DAUGHTREY, MOORE, and McKEAGUE, Circuit Judges.

**McKEAGUE, Circuit Judge.**  Defendant-Appellant Maurice Williams ("Williams") was

convicted of operating a continuing criminal enterprise ("CCE") and twenty-nine other counts.  On

appeal, Williams alleges four errors.  We **AFFIRM.**

## I.  BACKGROUND

On February 26, 2009, Williams was charged with thirty-two federal drug-related offenses

in a superseding indictment along with twenty-eight co-defendants.  At trial, more than twenty

witnesses testified for the Government regarding Williams's leadership role in an international drug

trafficking organization.  *See* R. 1139-48, Trial Transcript.  Trial testimony revealed that Williams

was involved in cocaine trafficking back in the 1990s.  R. 1148, p. 103-04.  Williams worked

"together as a team" with Kenyatta Powell beginning in 2001.  *Id.* at 112.  Williams and Powell

would pool their money to buy cocaine from Albert Bean and sell it to lower-level dealers.  *Id.* at

105, 108, 113-15. Before long, Powell introduced Williams to Terrence Pfeiffer so that he could join the cabal. *Id.* at 128. Pfeiffer subsequently introduced Williams to Antonio Carlton, who similarly assumed a role in the organization. R. 1140, p. 397. Williams and Powell jointly assigned drug-related tasks to Pfeiffer and Carlton, *id.*, until Powell went to prison in 2001. R. 1139, p. 131.

Once Powell was in prison, Williams took control of the entire operation. *Id.* at 133. In doing so, Williams supervised numerous additional individuals. To begin, under Williams's business model, Williams supplied other cocaine dealers, such as Kevin Cook, Cheo Greenhow, and Casey Drake, with cocaine on consignment. *See* R. 1141, p. 665; R. 1144, p. 1150; R. 1142, p. 731-32. Williams also hired multiple people to facilitate the smooth operation of his organization. First, there was Darrell Evans, who was responsible for transporting the cocaine. *See* R. 1141, p. 607-09. Later, when Williams worried that Evans might cooperate with police, Williams hired a woman named Crystal to make drug runs. R. 1144, p. 1156. Ultimately, Williams expanded his operation, and he hired Demetrius Slaughter and Marlon West to help transport the cocaine. R. 1139, p. 153; R. 1144, p. 1060. Kevin Cook, acting on Williams's behalf, also hired Wayne Marshall to help facilitate the cocaine delivery. R. 1143, p. 967-76. This rotating cast of characters facilitated Williams's cocaine and marijuana organization, but Williams also hired individuals exclusively for the purpose of selling marijuana, such as Malcom Ross. R. 1143, 928-32.

Unbeknownst to Williams, the Federal Bureau of Investigation ("FBI") began investigating his organization in January 2008. R. 1148, p. 33. In May, FBI agents received court permission to tap Cook's phone, and by June, additional wiretaps were authorized for a phone number identified in the first wiretap. *Id.* at 37, 44-45. In July, FBI agents executed search warrants at four locations

deemed likely to contain evidence of illicit activity, including Williams's residence in Charter Oak. *Id.* at 75.

Several months later, Williams organized a "business" trip to the Mexican border accompanied by six individuals: "Drake, Powell, West, a woman called Purple, Jeff Williams, and a Jamaican associate of Williams named John." Appellee Br. at 16. On February 26, 2009, the grand jury returned a superseding indictment against Williams and his co-defendants. R. 33, Superseding Indictment. By March 29, 2009, FBI agents arrested everybody but Williams. R. 1148, p. 77. Williams continued to elude capture until August 2009. *Id.* at 73, 93.

Williams's trial began on March 22, 2010. R. 1148. The jury returned a guilty verdict with respect to 30 counts: operating a CCE in violation of 21 U.S.C. § 848(a); conspiracy to distribute, possess with intent to distribute, and to distribute more than 5 kilograms of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(ii), and 846; conspiracy to distribute, possess with intent to distribute, and to distribute more than 50 kilograms of marijuana in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C) and 846; possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i); and twenty-five counts of the use of a telecommunications device to facilitate a drug transaction in violation of 21 U.S.C. § 843. Appellant Br. at 2.

On October 14, 2010, the district court sentenced Williams to 25 years' imprisonment on the CCE; five years' imprisonment for the firearm, to be served consecutively with the CCE; and four years on each of the telecommunications charges, to be served concurrently with the CCE. R. 1272, Sentencing Transcript. Williams timely appealed.

On appeal, Williams alleges four errors. First, Williams argues that the district court erred in "failing to instruct the jury that it must unanimously agree on the five individuals that appellant managed, supervised, or organized" during the CCE. Appellant Br. at 1. Second, Williams asserts that the district court "erred in denying Appellant's motion to suppress evidence" seized from the Charter Oak residence (the "residence"). *Id.* Third, Williams contends the district court erred in "denying Appellant's motion to suppress wiretapped communications . . . ." *Id.* Finally, Williams claims that the district court "erred by giving an improper instruction on venue to the jury as to the telecommunications offenses." *Id.* at 2.

## II. ANALYSIS

### A. Continuing Criminal Enterprise

The first issue Williams raises on appeal is his continuing criminal enterprise ("CCE") conviction. There are five elements in a CCE offense:

> (1) that the defendant committed a felony violation of federal narcotics laws; (2) that the violation was part of a continuing series of three or more drug offenses committed by the defendant; (3) that the defendant committed the series of offenses in concert with five or more persons; (4) that the defendant acted as an organizer, supervisor, or manager with regard to these five or more persons; and (5) that the defendant obtained substantial income or resources from this series of violations.

*United States v. Burns*, 298 F.3d 523, 535 (6th Cir. 2002).

There are two interrelated aspects to Williams's CCE appeal. First, Williams contends that the trial court erred "by failing to instruct the jury that it must unanimously agree on the five individuals that appellant managed, supervised, or organized during the alleged criminal conspiracy. . . ." Appellant Br. at 20. Williams also contends that the district court's instructions resulted in

"juror confusion," Appellant Br. at 32, resulting in a CCE conviction with inadequate evidence to satisfy the essential elements of the CCE crime. *Id.* at 27-30. Because Williams did not object to the jury instructions at trial, the "plain error" standard governs his CCE appeal, requiring Williams to demonstrate an error that "is obvious, affects substantial rights, and seriously affects the fairness or integrity of judicial proceedings." *United States v. Rayborn*, 491 F.3d 513, 521 (6th Cir. 2007); *see also* Appellant Br. at 30 (conceding that the plain error standard of review applies). This Court finds both strands of Williams's CCE appeal unpersuasive. Our analysis follows.

1.    The Trial Court Properly Instructed the Jury Regarding the CCE Charge

The fact that the district court's instructions to the jury did not require unanimity regarding the identity of the five subordinates in Williams's CCE does not establish plain error because such an instruction is neither required by the United States Supreme Court nor the law of this Circuit. *See Richardson v. United States*, 526 U.S. 813 (1999); *United States v. English*, 925 F.2d 154, 159 (6th Cir. 1991). Rather, *Richardson* held that a jury must unanimously agree that the defendant committed a "continuing series of violations" and also must unanimously agree about which violations constitute the "continuing series." *Richardson*, 526 U.S. at 815. Moreover, the *Richardson* Court assumed without deciding that "there is no unanimity requirement" for the other elements of a CCE because the other elements are "significantly different" from the "continuing series of violations" provisions. *Id.* at 824. "They differ in respect to language, breadth, tradition" and other factors. *Id.* Further, this Court has already expressly decided the issue. *See English*, 925 F.2d at 158. In *English*, we determined that the "jury [is] not required to determine unanimously the

identities of the five individuals whom defendant supervised, organized or managed." *Id.* at 158

(quoting *United States v. Linn*, 889 F.2d 1369, 1374 (5th Cir. 1989)).

Williams contends that "the same concerns of fairness that led the [*Richardson*] Court to

require unanimity in the 'series of acts' context, applies equally to the identities of the CCE

defendant's subordinates." Appellant Br. at 25. As Williams acknowledges, however, *Richardson*

nowhere requires jury unanimity regarding the identity of the CCE subordinates. Appellant Br. at

25. Moreover, this Court is bound by *English*. *See* 6 Cir. R 206(c); *United States v. Moody*, 206

F.3d 609, 615 (6th Cir. 2000) ("This panel may not overrule the decision of another panel; the earlier

determination is binding authority unless a decision of the United States Supreme Court mandates

modification or this Court sitting en banc overrules the prior decision."). Consequently, the district

court committed no error at all — let alone plain error — by not instructing the jury that unanimity

was required regarding Williams's CCE subordinates.

> 2.  Williams's CCE Conviction Rests on Sufficient Evidence

Williams also asserts that the Government failed to prove all the elements of the CCE

offense. In particular, Williams argues that the Government never established that he acted in

concert with five or more persons. *See United States v. Burns*, 298 F.3d 523, 535 (6th Cir. 2002).

Williams's argument is as follows:

> In closing, the Government only identified the names of four individuals (Powell,
> Cook, West, and Antonio Carlton) that it contended were being managed or
> supervised by Appellant. By only identifying those four individuals as subordinates
> managed by Appellant without a jury instruction requiring the jurors to unanimously
> agree on the identities of all five people he was alleged to have supervised in
> furtherance of the CCE, the Government left the jury to themselves to decide the

identity of the final supervisee from the large number of individuals referenced at trial . . . .

Appellant Br. at 29. Williams asserts this is problematic because "one member of the jury may have determined the guilt of Appellant on the CCE charge on the basis that at least one of the five individuals Appellant is alleged to have supervised may have simply been a buyer/seller rather that an actual subordinate in the criminal enterprise . . . ." *Id.* at 30.

The United States, however, notes that "[m]any witnesses at trial testified that Williams was in charge of the drug-distribution operation and named five or more of his subordinates." Appellee Br. at 23. The Government continues:

> Powell did. Evans did. Cook did. In addition, after hearing testimony from other witnesses who admitted that they worked for Williams's drug-dealing organization (and that it was, in fact, his organization) — including Carlton, Greenhow, Drake, Ross, and Marshall — the jurors could have added the numbers themselves. The evidence at trial thus established beyond a reasonable doubt that Williams acted as an organizer, supervisor, or manager with regard to five or more persons with whom he acted in concert in committing a series of drug crimes.

*Id.* at 23-24.

As the Government's brief demonstrates, the number of individuals who testified to Williams's CCE and admitted on the record to being one of Williams's subordinates far exceeds the statutorily required minimum of five people. *See* Appellee Br. at 23-24; *see also* 21 U.S.C. § 842(c)(2)(A). As such, this Court finds no plain error in an instruction that did not require jurors to unanimously identify the five subordinates. Accordingly, Williams's argument is unavailing.

**B.** **Motion to Suppress Evidence from Williams's Residence**

The second issue Williams raises on appeal is that the district court erred in denying his motion to suppress evidence from a search of his residence. *See* R. 855, Order. Specifically, Williams argues that the affidavit in support of the search warrant failed to establish a sufficient nexus between the residence and the items sought. R. 826, Motion; *see also* Appellant Br. at 40.

This Court reviews *de novo* the district court's determination that the issuing magistrate had a substantial basis for concluding that the search of the residence would uncover illegal evidence. *See United States v. Lapsins*, 570 F.3d 758, 763 (6th Cir. 2009); *United States v. Terry*, 522 F.3d 645, 647 (6th Cir. 2008). The magistrate's initial determination, however, is afforded great deference. *See Terry*, 522 F.3d 645, 647 ("[W]hen judging the sufficiency of an affidavit to establish probable cause in support of a search warrant, the Supreme Court has 'repeatedly said that after-the-fact scrutiny . . . should not take the form of de novo review. . . . Rather, reviewing courts are to accord the magistrate's determination 'great deference.'"). Accordingly, "this circuit has long held that an issuing magistrate's discretion should only be reversed if it was arbitrarily exercised." *Id.* (internal alterations omitted).

A warrant passes constitutional muster if the issuing judge has made "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (internal alterations omitted). Further, this Court has held that a warrant affidavit must be "judged on the adequacy of what it does contain, not on what it lacks, or

on what a critic might say should have been added." *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000) (en banc).

After a thorough review of the record, this Court finds no evidence of constitutional infirmity with respect to the warrant. The warrant contained a detailed affidavit provided by Special Agent Wozniak listing the numerous grounds in support of the search at the residence. *See* R. 838, Richard A. Wozniak Affidavit in Support of Search Warrant. First, Agent Wozniak's affidavit explained that, based on his sixteen years' experience, drug traffickers frequently maintain drug-related evidence "in locations to which [they] have frequently and ready access, i.e., homes . . . ." *Id.* at 2. Agent Wozniak then provided a lengthy account of the FBI's investigation linking Williams's organization to his residence. Wozniak explained that surveillance revealed that Williams had individuals stay at his condo when he was not present and "[y]ou[r] affiant knows that illegal narcotics dealers wi[ll] have individuals (security) at their 'stash houses' in case rival drug dealers attempt to rob them . . . ." *Id.* at 7. Agent Wozniak also detailed numerous incriminating conversations the FBI intercepted on Williams's phone that implicated his residence in the organization. On one phone call, the FBI intercepted Williams providing his partial address ("4077") in the context of "arranging illegal narcotics transactions." *Id.* at 7.

During another call, Williams asked an individual called Mike LNU if he "wanted a 'half' (believed to be half kilogram of cocaine)" and "Mike replied, 'a quarter or some thing [sic]." Agent Wozniak explained that, "[d]uring this time frame Williams called several other individual[s] and told them to come to the condo." *Id.* FBI surveillance established the condo was the residence, and after the individuals departed, Williams "called Mike and asked Mike if Mike had called. Mike

replied, 'Yea. It was three and a half though.'" *Id.* Williams responded, "'It what?,'" and Mike replied, "'[t]hat mother fucker was short, buddy.'" *Id.* Williams then said: "'No bro. You better fix your scale.'" *Id.*

The FBI recounted another call where Williams spoke with a man named Drake who "advised Williams that he had some 'chunks' (cocaine) and asked Williams if he was concerned about anyone at the condo. Williams responded that he had more than that and no one knows about it." *Id.* at 8 (capitals in original omitted). In yet another call, Carlton advised Williams that Powell was stealing Carlton's money that he had been storing at Powell's mother's house. *Id.* Carlton advised Williams he needed a new place to store his money, at which point Williams interjected "and stated no, that he (Williams) had to find another condo (referring to 4077 Charter Oak Way)." *Id.* (capitals in original omitted).

Williams asserts that the warrant was constitutionally infirm because, for example, Agent Wozniak does not explain why he inferred the word "smoke" in one of the telephone calls to refer to marijuana. Appellant Br. at 40. Nonetheless, the contents of the warrant should be "judged on the adequacy of what it does contain," *Allen*, 211 F.3d at 975, and Wozniak's affidavit provided grounds for the magistrate to make a "practical, common-sense decision," *Gates*, 462 U.S. at 238, that there might be contraband at the residence. As such, the district court correctly determined that the magistrate had a substantial basis for granting the warrant to search the residence. *See Lapsins*, 570 F.3d at 763. Accordingly, this Court finds that the district court correctly denied Williams's motion to suppress the evidence stemming from the search of the residence.

**C.     Motion to Suppress Evidence Stemming from Court-Ordered Wiretaps**

The third issue Williams raises on appeal is that the trial court erred in denying his motion

to suppress wiretaps of three target telephones. *See* Appellant Br. at 40; *see also* R. 825, Motion to

Suppress Wiretaps. Specifically, Williams argues that "Agent Wozniak's affidavit in support of the

wiretap of Target Telephone #1 ("TT#1") failed to meet the necessity requirement pursuant to 18

U.S.C. § 2518(1)(c), and that the subsequent affidavits submitted in support of requested taps of

Target Telephones #2 ("TT#2") and #3 ("TT#3") contained recorded conversations obtained illegally

from the TT#1 and thus both applications were tainted as fruit of the poisonous tree." Appellant Br.

at 48.

This Court reviews a district court's denial of a motion to suppress for clear error with regard

to its finding of facts and its conclusions of law de novo. *United States v. Hurst*, 228 F.3d 751, 756

(6th Cir. 2000). A wiretap application must include "a full and complete statement as to whether

or not other investigative procedures have been tried and failed or why they reasonably appear to be

unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). This "necessity"

requirement ensures that "wiretapping is not resorted to in a situation in which traditional

investigative techniques will suffice to expose the crime." *United States v. Stewart*, 306 F.3d 295,

304 (6th Cir. 2002). "Generally, a district court's findings that the requirements of 2518(1)(c) have

been met are afforded considerable discretion." *Id.* (internal alterations omitted).

Williams contends that the wiretaps the government acquired failed the necessity

requirement. Specifically, he argues that a variety of non-wiretap investigatory techniques, ranging

from "trash pulls" to visual surveillance and closed-circuit television monitoring "were turning up

significant ties within the organization . . . ." Appellant Br. at 50. He explains that the success of these efforts "was amply demonstrated by the fact that on April 28, 2008, just a few days before the Application for TT#1 was submitted by police on May 5, 2008," a confidential source was "actively providing information" to law enforcement. Appellant Br. at 50.

In response, the Government contends that section 2518(1)(c)'s strictures were satisfied through Special Agent Wozniak's affidavit — "a 16-page, 22 -paragraph section titled 'need for interception'" — that documented "the past use and potential future utility of confidential informants, undercover agents, interviews and questioning before the grand jury, pen registers, physical surveillance, and search warrants . . . ." Appellee Br. at 33-34. The Government explains that "although each [method] had been tried and could provide some information, none could reveal the full scope of the multi-state trafficking conspiracy or all of its members." *Id.* at 34. Hence, the wiretap was necessary to obtain a "more complete window on the operation." *Id.*

In its order denying Williams's motion, the district court held that the fact that law enforcement made inroads into Williams's organization did not negate the need for more drastic measures. R. 855, Order. Rather, "the evidence and information from the confidential sources did not relate or describe the inner workings of the organization in its entirety." *Id.* at 8. The affidavits in support of the application for the wiretaps "detailed all the investigative steps that had been taken up to that point, but explains [sic] that the government had failed to obtain sufficient evidence to identify and prosecute the entire drug trafficking organization." *Id.* at 8. Accordingly, the district court rejected Williams's motion, finding that "the government gave serious consideration to several

non-wiretap techniques and informed the Magistrate Judge of the reasons for the investigators' beliefs that conventional methods had achieved only limited success." *Id.* at 9.

The district court correctly denied Williams's motion to suppress. The "mere fact that some investigative techniques were successful in uncovering evidence of wrongdoing does not mandate that a court negate the need for wiretap surveillance." *Stewart*, 306 F.3d at 305. Indeed, where "it does not appear that the government could have uncovered the full scope of the conspiracy, especially not in a relatively safe manner, without the wiretaps," this Court has recognized that wiretapping is appropriate. *Id.* This is especially true "when the telephone is routinely relied on to conduct the criminal enterprise under investigation." *Id.* After a thorough review of the record, it is evident that this was precisely such a case. *See*, *e.g.*, Appellee Br. at 35 (noting that one of Williams's co-defendants testified "that he was 'communications central because everybody was calling my phone.'"). Accordingly, Williams's argument is unavailing.

**D.      The District Court's Jury Instructions Regarding Venue**

Williams's final point on appeal is that the district court "erred by giving an improper instruction on venue to the jury on the telecommunications charges." Appellant Br. at 53; *see also* R. 976, Jury Instructions, p. 48 (instructing the jury "that the defendant, Maurice Williams, either used the communication facility in the Southern District of Ohio, or used the communication facility to contact persons within the Southern District of Ohio, or used the communication facility with the intent to affect conduct in the Southern District of Ohio."). Specifically, Williams argues that no federal circuit has interpreted § 843(b) to provide for a conviction when a defendant's use of a communication facility is intended merely to affect conduct in the jurisdiction. *Id.* at 55. Instead,

- 13 -

Williams contends, "all [federal circuits] have required that the government must prove that the call was either made from, or received in, the district." *Id.* Williams concludes that, "[v]iewing the jury charge given in its entirety, nowhere has the correct venue instruction been conveyed to the jury in a clear and concise manner," and therefore he charges that "the court committed plain error in giving this incorrect and impermissibly broad instruction of law to the jury . . . ." *Id.*

Because Williams failed to object to the jury instructions at trial, this Court applies a plain error standard of review. *See* Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 732 (1993); *United States v. Kuehne*, 547 F.3d 667, 697 (6th Cir. 2008); Appellant Br. at 53 (conceding that plain error applies). To establish plain error, there must be (1) error, (2) that is plain, and (3) that affects substantial rights. *United States v. Webb*, 403 F.3d 373, 380 (6th Cir. 2005). "If all of three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (citing *Johnson v. United States*, 520 U.S. 461, 466-67 (1997))(alterations omitted).

Williams faced twenty-three counts of violating 21 U.S.C. § 843(b). Section 843(b) renders it "unlawful for any person knowingly or intentionally to use any communication facility in committing or in causing or facilitating the commission of any act or acts constituting a felony . . . ." Pursuant to 18 U.S.C. § 3237, "any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed."

Williams acknowledges that no Sixth Circuit cases directly support his argument. Nonetheless, he asserts that "a review of cases from sister circuits demonstrates that the very few federal courts that have addressed this question have interpreted this venue provision to mean that in order to prosecute violations of 21 U.S.C. § 843(b), venue is proper either in the district where the call was placed or in the district where the call was received." Appellant Br. at 53-54. Further, he "avers that no federal circuit has interpreted § 843(b) to allow a prosecution in a particular venue on the basis that the defendant merely 'used a communication facility with the intent to affect conduct in the Southern District of Ohio,' as Appellant's trial court charged ." *Id.* at 55. This is significant, Williams argues, because the jury instruction "has no basis in law; fails to comport with the plain language of 18 U.S.C. § 3237 or § 843(b) . . . and has impermissibly broadened the venue requirement to the benefit of the Government and the detriment of Appellant . . . ." Appellant Br. at 58.

The Government responds by first pointing out that the district court consulted with both parties when drafting the jury instructions for the §843(b) counts, and that the jury instructions were consistent with the outcome of that conference. Appellee Br. at 36; *see also* R. 1152, Tr., p. 1023-24. Presumably, this argument is meant to concretize the extent to which Williams forfeited this claim for appellate review. Second, the Government argues that Williams's appeal fails under plain error scrutiny. Appellee Br. at 37.

After reviewing the parties' arguments and the record, this Court finds that Williams's claim fails to survive plain error review. Assuming without deciding that the district court's jury instructions constituted an error, this Court determines that Williams also fails to demonstrate that

the alleged error affected his substantial rights. Although Williams argues that "at least one wiretapped call" was made in Maryland, Appellant Br. at 57, this call was made to a CCE subordinate who worked for Williams in the Southern District of Ohio. Consequently, venue was proper even under Williams's presentation of the facts, because the call was received in Ohio. As such, Williams fails to show that the district court's instruction affected his conviction. Further, while Williams argues that "it is impossible to determine" if the call participants were actually in the Southern District of Ohio, Appellant Br. at 58, it is reasonable to infer that a member of Williams's CCE who operated in the Southern District of Ohio also received a phone call from Williams about that operation while in the Southern District of Ohio. *See United States v. Avery*, 128 F.3d 966, 971 (6th Cir. 1997) ("Circumstantial evidence on its own can sustain a jury's verdict, and such circumstantial evidence need not remove every reasonable possibility of doubt."). Accordingly, Williams failed to sustain his burden of demonstrating that his substantial rights were prejudiced. Consequently, plain error review requires this Court to affirm the district court's jury instructions with regard to Williams's twenty-three §843(b) charges.

## IV. CONCLUSION

For the foregoing reasons, this Court **AFFIRMS** the district court's judgment.